## W. W. OXSHEER v. W. T. WATT.

### No. 566.—Decided June 21, 1897.

**1. Chattel Mortgage—Description—Election by Mortgagee.**

The description of property in a mortgage is sufficient if it identify the articles by conferring an express or implied power to select them from a larger number of similar description. (P. 127.)

**2. Same.**

A chattel mortgage of fifty mares in a named brand, the mortgagor having three hundred in that brand, confers an implied right upon the mortgagee to select the mortgaged property from the larger number. (P. 127, 128.)

**3. Same—Foreclosure.**

It would be better to require the selection to be made before or at the time of the foreclosure, but the mortgagor or a purchaser with notice could not complain of a decree foreclosing upon fifty average animals out of the three hundred. (P. 128.)

QUESTIONS CERTIFIED by Court of Civil Appeals for the Third District, in an appeal from McLennan County.

*Harris & Saunders*, for appellant.—A mortgage failing to describe property intended to be conveyed in a manner that will distinguish it from other like property owned by the mortgagor or included in a larger bulk or number of like property is void. Jones, Chat. Mort., secs. 54, 55, 56; Cleveland v. Williams, 29 Texas, 204.

The judgment of the court is contrary to law in that: "It requires W. W. Oxsheer to deliver to the sheriff of Lubbock County at the county seat of said county by June 1, 1896, fifty mares, to be taken out of the herd belonging to W. W. Oxsheer, in Hockley County, the same to be of average quality and value of the herd aforesaid," in order to satisfy the judgment for $1125, which is rendered against him, and prevent execution thereon. The judgment should be a full and complete determination of the case, and leave nothing to the judgment or discretion of others after the rendition of the judgment towards the enforcement thereof. Rev. Stats., art. 340.

*R. I. Monroe* and *J. R. Downs*, for appellee.—Between the mortgagor and mortgagee and their privies any description is good if the parties themselves knew and understood what property the mortgage covered, and a third party can not complain unless he was actually misled by the description. Lay v. Cardwell, 33 S. W. Rep., 595; Ranck v. Howard-Sansom Co., 3 Texas Civ. App., 507; Elliott v. Long, 14 S. W. Rep., 145; Call v. Gray, 75 Am. Dec., 141; Jones, Chat. Mort., secs. 155, 156; Cobby, Chat. Mort., secs. 186, 188.

DENMAN, ASSOCIATE JUSTICE—In this case, the Court of Civil Appeals has certified the following explanatory statement and questions, to-wit:

"This suit was brought by the appellee, W. T. Watt, August 16th,

1895, against F. G. Oxsheer, J. T. Beall and W. W. Oxsheer upon two promissory notes and to foreclose a deed of trust or mortgage made to secure their payment. F. G. Oxsheer and Beall are sued as makers of the notes, and W. W. Oxsheer as party in possession of the property mortgaged, the same being personal property, and upon the ground that he has other personal property of like description with that mortgaged, all in one pasture and not distinguishable therefrom, and that before the mortgage can be foreclosed plaintiff has reason to believe W. W. Oxsheer will have sold the greater part, or all, of the mortgaged property.

"The property mortgaged and conveyed to the trustee by F. G. Oxsheer is described as follows: 'Fifty (50) mares branded F2.' There is no additional description or means of identification in the mortgage. It is dated April the 10th, 1891.

"At the time the mortgage was executed, F. G. Oxsheer had about 300 mares in the F2 brand.

"W. W. Oxsheer claimed all the 300 mares in the F2 and other stock owned by F. G. Oxsheer, January 16th, 1892, under the following title: On that date, F. G. Oxsheer made a deed of trust to Scott Field, trustee, conveying all his stock including all the mares in the F2 brand to secure J. H. Drennan, or to indemnify him as surety for F. G. Oxsheer on two notes aggregating $12,000, for which amount F. G. Oxsheer had executed to Drennan his two notes. The property was sold by the trustee pursuant to the deed of trust, on the 31st day of January, 1893, to pay the unpaid indebtedness of F. G. Oxsheer to Drennan, amounting to $5809.90, and W. W. Oxsheer bought the property at the sale, paying at the time $5809.90. Bill of sale was executed by the trustee, at the time, to W. W. Oxsheer, pursuant to the sale.

"For a recited consideration of $18,000, on the 4th day of August, 1891, F. G. Oxsheer conveyed by bill of sale to W. W. Oxsheer, who was F. G.'s father, all his stock of horses, mares, etc., including the 300 mares in the F2 brand, describing the stock, being the same described in the Drennan deed of trust, Drennan at the time having an unrecorded mortgage on the same stock to indemnify him as surety on the two notes before referred to. It was understood at the time that W. W. Oxsheer would assume the payment of the two notes. The bill of sale by F. G. to W. W. Oxsheer was absolute and not subject to the mortgage to secure Drennan. At the same time of the mortgage to Drennan, F. G. Oxsheer executed to his father, W. W. Oxsheer, a second mortgage, subject to the Drennan mortgage, to secure W. W. Oxsheer in payment of $15,612.47. On the same day prior to the deed of trust to secure Drennan, W. W. Oxsheer reconveyed back to his son, F. G. Oxsheer, all the stock formerly transferred to him by his son. This was done in order to make good the security to Drennan, and because he did not wish to pay the two notes he had assumed.

"At the time of the sale by the younger to the elder Oxsheer, the former was indebted to the latter in at least the $18,000, the recited con-

sideration of the transfer, for loaned money and money paid for him on security debts.

"On the 19th day of October, 1891, W. W. Oxsheer, by his agent Smith, wrote a letter to W. T. Watt, plaintiff, stating that he had purchased the F2 stock of horses, and asked permission to move the stock from the Taylor County pasture to the Nolan County pasture as the grass was better there and the horses would winter better. The permission was granted and the stock moved to Nolan County. The horses were always in the possession of F. G. Oxsheer; no possession was delivered to Watt, and no actual delivery made to W. W. Oxsheer, but F. G. Oxsheer kept possession of them and managed them as agent of his father after the sale under the Drennan deed of trust. W. W. Oxsheer, at the time of his purchase at such sale, and at the time he obtained permission to move the stock to Nolan County, knew of the mortgage to Watt.

"Watt has never seen the mares mortgaged to him. The only knowledge he had of the mares mortgaged to him was at the time his mortgage was executed and was from what F. G. Oxsheer told him, and he told him that they were in Taylor County, and told him he had 50 mares branded F2 in Taylor County. Watt did not know Oxsheer had more than fifty, or whether he had any mares at all, but supposed that he had a considerable number more than fifty, as he, Oxsheer, was a stock man, and from his reputation as such. The mortgage to Watt was executed in the Provident Nat'l Bank in Waco.

"At the time the mortgage to Watt was given F. G. Oxsheer had 300 mares in the F2 brand. He had had them in Haskell County, and some time during the spring of 1891 they were moved to Taylor County and were put in what was known as the old 'Dee grounds' pasture. A part of them were not moved but remained in Haskell County. At the time of the mortgage to Watt nothing had been done to separate or distinguish the mares intended to be mortgaged from other mares in the same brand. It is not shown that there were only the fifty head of mares in Taylor County at the time of the mortgage, nor that there were less than that number, and the testimony does not identify the mares mortgaged, or so describe them as that they could then or now be separated from others in the same brand. Since their removal to Nolan County the stock in the brand F2 have been kept together.

"The questions we certify to the Supreme Court are: Construed with the facts stated showing that there were 300 mares in the F2 brand, and with other facts attempting to identify the mortgaged property, was the mortgage void for want of identity and description of the property mortgaged? And can the mortgage be foreclosed in the proceedings against W. W. Oxsheer, who had notice at the inception of his claim of the plaintiff's mortgage, on an undivided interest of fifty average head of the whole number."

It will be observed that the certificate does not give the substance of the trust deed executed by F. G. Oxsheer to the trustee on the "Fifty

(50) mares branded F2" to secure the notes due Watt. We will assume that it is in the ordinary form conveying the property to the trustee to secure the notes, with power to sell to pay the debt evidenced thereby when due. Such instrument read in the light of the circumstances above stated, surrounding its execution, evidences an intention on the part of the parties thereto of fixing a lien, not upon an undivided interest in the herd of "300 mares in the F2 brand," but upon fifty of them. In order to give effect to such intent, there must be found in the instrument either, (1) some descriptive matter, which, when applied to the herd, will enable one to ascertain the very animals intended to be conveyed; or (2) an express or implied power of selection or, in legal terminology, "election." Since the entire herd were branded "F2," it is clear that the trust deed conveying "Fifty (50) mares branded F2," furnishes no descriptive matter which, when applied to the herd, will enable one to ascertain the very animals intended to be conveyed;" and we do not understand that there is any claim that the instrument contains an "express power" of election. This brings us to the real question before us, does it carry upon its face, an "implied power" of election? We are of the opinion that it does, and that for that reason, it is not void. In reporting Heyward's case, Coke, in stating the rules of law governing "election," as an illustration of his fourth rule, says: "But if I give you one of my horses in my stable, there you shall have election   *   *   *   and, if one grant to another 20 loads of hazel, or 20 loads of maple, to be taken in his woods of D., there the grantee shall have election." Heywood's case, 2 Coke, 37; Coke, Litt., 145; Bac. Ab. Election, (B). The first of these examples of implied power of election given by these great jurists, seems to be taken from Mervyn v. Lyds, Dyer, 91, where it is said: "But admit their power and ability to make the sale, then we must see what thing and what number of trees are sold, for the words are 'all those their woods and trees which then might reasonably be spared.' What manner of certainty is in these words, and who shall be the judge of the sparing, the vendor or the vendee? And it seems neither of them; yet by common intendment, the vendor has more knowledge of the necessity of trees being preserved, and which may be spared as superfluous, to the maintenance of the inheritance. And it is, like a gift made by me of all those my horses which may be best spared; this is void for want of certain pointing out or assignment; but if I give you one of my horses, although that be uncertain, yet by your election that may be made a good gift." In Palmer's case, 5 Coke, 24, Palmer having sold 600 cords of wood to be taken out of his forest upon his own assignment, and having refused when called upon to assign or designate the wood, it was held that the grantee had the right to select same "for the grantor cannot, by his own act, or default, either subvert, or derogate from his grant." In Bac. Ab. Election (A), it is said: "If a man grants twenty acres, parcel of his manor, without any other description of them; yet the grant is not void, for an acre is a thing certain, and the situation may be reduced to a certainty by the

election of the grantee." In Wofford v. McKenna, 23 Texas, 46, this court, through Wheeler, Chief Justice, say: "A grant by the owner of a certain number of acres in a particular tract, would confer a right of election upon the grantee, and authorize him to locate the quantity in any part of the tract he saw proper to elect, upon the principle that a conveyance must be held to pass some interest, if such effect may be given to it consistently with the rules of law, and that, if uncertain or ambiguous, it must be construed most strongly against the grantor." In Call v. Gray, 37 N. H., 428, it was contended that a mortgage of a certain number of beds, chairs, etc., without any further designation, in a house containing many other articles of the same kind, was void because the instrument contained no description by which the property intended to be mortgaged could be designated, but the court held it valid, saying: "The doctrine is same as that which prevails in conveyance of real estate—that the grant shall be taken most strongly against the grantor.  *  *  *  The mortgagor had nothing further to do to make the mortgage perfect, and the plaintiff had the right to make a selection of the articles.  The mortgage, then, so far as the instrument itself went, was legal between the parties." We therefore, answer the first question in the negative. Elliott & Roe v. Long, 77 Texas, 467; Leighton v. Brown, 19 Neb., 546; Frost v. Bank, 68 Wis., 234.

The facts certified do not show that W. W. Oxsheer is in any better position to prevent the foreclosure than F. G. Oxsheer would have been had the title not passed out of him.  While it would have been more regular for the court to have required the exercise of the power of election, before or as part of the foreclosure proceedings, and then to have ordered the sale of the mares selected, we do not see that W. W. Oxsheer is prejudiced by a foreclosure on average mares, and so answer the second question.

We are aware that there are many cases seeming to hold such instruments void for want of description.  In some of them the question was one of notice; in others there was no facts stated in the instrument from which the bulk of things, out of which was to be taken the smaller number intended to be mortgaged, could be identified; in most of them the real question was whether title passed by the instrument; while in others the doctrine of election above adverted to seems not to have been considered.  In cases where it is necessary for a party to show title an instrument with such a description would not avail him without an election for "where the things are several, nothing passes before election," and "therefore if I have three horses, and I give you one of my horses, in this case the election ought to be made in the life of the parties, for inasmuch as none of the horses is given in certain, the certainty and thereby the property begins by election." Heywood's case, supra.  The distinction between such cases and the one before us is referred to in Call v. Gray, supra, where it is said:  "The cases which show that trespass and trover cannot be maintained until the property is separated and identified, depend upon the principle that property in the particular

articles is indispensible, in order to sustain those actions. If specific articles are alleged to have been converted or injured, the plaintiff must show such articles to be his. * * * And the question in this case is, not as to the plaintiff's right to maintain trespass or trover, but as to the effect of the mortgage."