## THE JOHN S. BRITTAIN DRY GOODS COMPANY v. BLANCHARD, SHELLY & ROGERS.

### No. 10985.

1. CHATTEL MORTGAGE—*Title and Ownership—Accommodation Paper—Fraud.* F. arranged with B. S. & R. for a loan of money to enable him to purchase a herd of cattle, agreeing to execute a bill of sale of them when purchased to V., and that V. should in turn execute notes and mortgages upon them to secure the money, and representing that he did not wish to execute the securities in his own name, because to do so might affect the credit of a bank of which he was president; the arrangement was carried out; except that F. did not execute the bill of sale to V. *Held*, that in the absence of a showing of fraudulent purpose upon the part of B. S. & R. the mortgage was not invalid as to third persons because of V.'s lack of property interest in the cattle.

2. ——— *Cattle in Herd—Description Sufficient.* A chattel mortgage of 100 head of cattle, describing them, and being one-half of a total herd of 200 head of like description, is not void for uncertainty because of a lack of separation of the mortgaged portion out of the whole number. The mortgagee in such case has a right of selection of the 100 head, and the description is sufficiently definite, upon the ground that that is certain which can be made certain.

Error from Decatur district court; A. C. T. GEIGER, judge. Opinion filed March 11, 1899. Affirmed.

*Tully Scott,* and *Johnson, Rusk & Stringfellow,* for plaintiff in error.

*McCoy & Olmsted,* and *Bertram & Wilson,* for defendants in error.

The opinion of the court was delivered by

DOSTER, C. J.: This was a contest between the John S. Brittain Dry Goods Company, the plaintiff in error, an attaching creditor, and Blanchard, Shelly & Rogers, the defendants in error, mortgage creditors of one J. J. Foltz. The controversy was over the valid-

ity of a mortgage upon live stock executed to defendants in error. Foltz was a merchant, a farmer, and live-stock dealer, and was also president of a bank. He owed the plaintiff in error about $3000 for goods purchased in his mercantile business. He desired to buy 200 steers from one F. S. Wilcox, of Nebraska, and arranged with defendants in error for a loan of money from them to enable him to do so. It was agreed between the defendants in error and Foltz that the latter should purchase the cattle, take them to his farm near Oberlin, this state, and execute a bill of sale of them to one N. J. Vinson, a man in his employ, who in turn should execute notes and mortgages upon them to the defendants in error as security for the borrowed money, whereupon they should pay it to Wilcox as the purchase-price of the cattle. Foltz stated to defendants in error, as his reason for not executing the notes and mortgages himself but procuring Vinson to do it, that being in the banking business the making of a mortgage by him might affect the credit of his bank. The arrangement was fully carried out, except that Foltz failed to execute the bill of sale to Vinson.

The borrowed money was secured by two notes and mortgages all executed and dated the same day; one note and mortgage being for $3802.74, the other for $3675. The cattle covered by the one securing the larger amount were described as follows: "100 head of two-year-old steers, red and black, this day purchased of F. S. Wilcox, of McCook, Neb.; branded '4A' on left side, or 'A4,' or 'Q.'" The cattle covered by the one securing the smaller amount were described as follows: "100 head two-year-old steers, reds and blacks, all branded '4A' on left side, this day purchased of F. S. Wilcox, of McCook, Neb." There

was no separation of the 200 head of steers into lots of 100 each to correspond with the two mortgages, but they were fed and kept together as an entire herd; those covered by one mortgage being indistinguishable from the others, except in the case of such of those included in the larger mortgage as were branded "A4" or "Q." These, however, were few in number.

Some time after the execution of these mortgages, 108 of the cattle, presumably those most marketable, were selected from the total of 200 and were sold. With the proceeds of the sale the note and mortgage of $3802.74 were paid. The controversy which subsequently arose relates only to the remaining 92 head covered by the smaller mortgage of $3675. The plaintiff in error, conceiving this mortgage to be fraudulent, brought suit upon its merchandise account against J. J. Foltz, and attached the cattle as belonging to him. The defendants in error intervened in the attachment suit and filed an interplea, and subsequently an amended interplea, setting up their mortgage claim. The court made findings of fact favorable to the interpleaders, and rendered judgment in their favor. From this judgment error has been prosecuted to this court.

Several contentions are made by the plaintiff in error. One is that the findings of fact are contrary to the evidence; another, that the defendants in error, in their amended interplea, abandoned their claim of mortgage lien, and elected to claim one by subrogation to the vendor's lien of Wilcox, the seller of the cattle, and that the findings and judgment of the court, rightly interpreted, award such kind of lien; *ergo*, there was no lien at all, because Wilcox had no purchase-money claim to which subrogation could be made. Another contention is that the chattel mort-

gage was not filed at such a time and in such manner as to charge the creditors of Foltz with notice; another, that Vinson had no property interest in the cattle in question, and could not, therefore, execute a valid mortgage upon them, and that the arrangement between the various parties by which it was agreed that he should do so could not supply the lack of interest necessary in such cases to support the mortgage; lastly, that the description of the cattle in the mortgage in question was void for uncertainty, in view of the fact that there was no separation of the animals covered by the two mortgages, and the description in one would apply as well to those included in the other.

We have examined these various claims of error. None of them is well founded. Only the last two will be specially noticed. A discussion of the others would in some instances require a setting out and interpretation of the language of the pleadings, findings, and judgment of the court, neither necessary nor useful to be done; and in others would require an examination of conflicting evidence, which, under the repeated decisions of the court, we will not undertake.

It is true that Vinson had no interest in the cattle. He was employed as a mere intermediary through whom to transmit a mortgage lien upon them to the defendants in error, but the plaintiff in error does not claim that the arrangement by which he was so to act was entered into by the defendants in error with fraudulent purpose upon their part. Blanchard, Shelly & Rogers agreed to accept securities from Vinson upon the assurance by Foltz that he would transfer the legal title to Vinson by bill of sale. They did not agree to accept them from Vinson in order to aid Foltz to cover up the title to his property, but to avoid the credit of Foltz's bank becoming affected, as it was

Brittain v. Blanchard.

represented it might be if Foltz, its president, were to execute a mortgage in his own name. Their assent to this arrangement for this reason may not have been laudable or praiseworthy, but it was not fraudulent in fact as against Foltz's creditors.

The description of the cattle is not uncertain. The two mortgages, executed as they were at the same time upon unseparated portions of the same herd of stock, to secure only nominally separated portions of the same debt due to the same creditor, and which stock was bought at the same time from the same vendor with the same funds, may well be looked upon in equity, in such a controversy as this, as constituting a single instrument covering an aggregate of 200 head of animals, of which ninety-two still remain; but looking at the two mortgages as separate and distinct, and covering different cattle, the right to enforce the one now in question upon the unascertained and unselected 100 head of steers out of the total 200 head was maintainable upon the ground of a vendee's right of election. '' If I give you one of my horses in my stable, there you shall have an election, . . . and if one grant to another twenty loads of hazel, or twenty loads of maple, to be taken in his woods of D., there the grantee shall have election.'' (*Heyward's Case*, 2 Coke, 37.) If a mortgage upon an unselected portion of a whole number of things of the same kind is good between the parties upon the principle of election by the mortgagee, it is as good as against third parties, because the instrument in such a case gives a hint or clue to inquiring persons which, if followed, will lead to definite information, by bringing on an election of the mortgagee. An election may be compelled, if equitable to do so, and the description in the mortgage will be regarded as sufficiently definite,

upon the ground that that is certain which can be made certain. The case of *Oxsheer v. Watt*, 91 Tex. 124, 41 S. W. 466, is full to this point and meets our approval. An election having been made under the larger of the two mortgages before the attachment of the plaintiff in error was levied, there remained only enough cattle to secure the other note and mortgage of $3675. These cattle were selected for the purpose of inclusion within that mortgage and the security of that note by the very act of selection of the others which were sold to discharge the larger note and mortgage.

It may have been that some of the few steers branded "A4" or "Q," and which were alone covered by the larger mortgage, remained among the ninety-two head, the subject of this controversy. As to this we are not advised. It is not claimed that such was the case, and as to the right of lien upon such, if any there may have been, we express no opinion.

The judgment of the court below is affirmed.