NEW ENGLAND NATIONAL BANK OF KANSAS CITY, MISSOURI, v. NORTHWESTERN NATIONAL BANK OF CHICAGO et al., Appellants; THIRD NATIONAL BANK OF SPRINGFIELD, MASSACHUSETTS, Interpleader.

Division One, December 24, 1902.

1. **Mortgage:** ON NON-EXISTENT PROPERTY: ON PROPERTY NOT OWNED. As between the mortgagor and mortgagee, a chattel mortgage is

sufficient to convey any title to personal property the mortgagor has at the time it is made and any he may afterwards acquire. But as between a mortgagee who has never been in possession and subsequent mortgagees, purchasers, or attaching creditors, a mortgage on cattle which did not exist at the time it was made and on cattle which the mortgagor did not then own and of which he was not then in possession it is not sufficient, even though the mortgagor may then have had an option on them with whose terms he afterwards complied and was put in possession. In order that such mortgagee may claim such after-acquired property, as against subsequent mortgagees or attaching creditors, his mortgage must both contain a provision conveying such after-acquired property and he must take actual possession thereof before the liens and rights of the subsequent mortgagees attach.

2. ————: FICTITIOUS NAME: NOTICE. A mortgage in the name of a fictitious mortgagor does not impart notice to a subsequent mortgagee.

Appeal from Jackson Circuit Court.—*Hon. E. P. Gates,* Judge.

REVERSED AND REMANDED (*with directions*).

*Haff & Michaels, Isaac E. Congdon* and *John W. Parish* for First National Bank of Omaha, appellant; *Beardsley, Gregory & Kirshner* and *Robert F. Walker* for State Bank of St. Louis and Elmore & Cooper, appellants.

Baumbaugh did not acquire actual or constructive possession of any of the cattle on or before October 14, 1898. (a) He never, personally, at any time had possession. Claflin v. Rosenberg, 42 Mo. 449; Swiggett v. Dodson, 38 Kan. 707; Harris v. Pence, 93 Iowa 48, 61 N. W. 927. (b) Nor did Baumbaugh ever have any constructive possession of the cattle. Doak v. Brubaker, 1 Nev. 218; Brunswick v. McClay, 7 Neb. 137; Hurlburd v. Bogardus, 10 Cal. 519; Flanagan v. Wood, 33 Vt. 332; Bank v. Gilbert, 174 Ill. 491; Sutton v. Ballon, 46 Iowa 517; Claflin v. Rosenberg, 42 Mo. 449; How v. Taylor, 52 Mo. 598; Worley v. Standley, 22 Mo. App. 552.

*Charles H. Dummer* and *Dobson & McCune* for Northwestern National Bank of Chicago, appellant.

(1)  The T and C cattle described in the bill of sale from Gillett to Baumbaugh and the mortgage from Baumbaugh to the A. J. Gillespie Company, both dated October 4, 1898, were not only not owned by the grantors but were not in existence in contemplation of law.  The property mortgaged not being in existence at that time, the mortgage was absolutely void. Jones, Chattel Mortgages, sec. 138; 5 Am. and Eng. Ency. Law (2 Ed.), 979; Jones v. Richardson, 10 Met. 488; Looker v. Peckwell, 38 N. J. L. 253; Hutchinson v. Ford, 9 Bush (Ky.) 318; Long v. Hines, 40 Kan. 216; Rochester Distillery Co. v. Racy, 142 N. Y. 570; Anchor Brewing Co. v. Burns, 52 N. Y. Sup. 1005.  (2)  The bill of sale from Gillett to Baumbaugh, of October 4, 1898, was also a nullity and absolutely void, for the same reason, i. e., the non-ownership and existence of the property.  Tiffany on Sales (Ed. 1895), p. 24; 20 Am. and Eng. Ency. Law (2 Ed.), 916; Low v. Pugh, 108 Mass. 347; Lunn v. Thornton, 1 Manning, Granger & Scott 379; Robinson v. Hirschfelder, 59 Ala. 503; Head v. Goodwin, 37 Me. 181.  (3)  The mortgage of Baumbaugh to the A. J. Gillespie Commission Company is void as to the T and C cattle in controversy, for the further reason that it does not by its terms attempt to convey future-acquired property.  Jones, Chattel Mortgages (2 Ed.), sec. 173 A.; Tapfield v. Hillman, 6 Manning & Granger 245; Montgomery v. Chase, 30 Minn. 132; Farmers Loan Co. v. Bank, 15 Wis. 465 (Old Ed. 424); Phillips v. Both, 58 Iowa 499; Iowa Bank v. Taylor, 67 N. W. 677; Pennock v. Cole, 23 Howard 127.  (4)  As the Gillespie Commission Company, the mortgagee, and its assignee, the Springfield Bank, never at any time got possession of the T and C cattle prior to the time our lien attached, or in fact at any time, the Springfield Bank has no right, in law or equity, to said cattle or the proceeds of the sale thereof, as against the Northwestern National Bank, which did obtain actual possession thereof under its

chattel mortgage. Single v. Walsh, 20 Wis. 419 (Old paging 398); Griffith v. Douglas, 73 Me. 532; Lamson v. Moffitt, 61 Wis. 153; Rochester Brewing Co. v. Racy, 142 N. Y. 570; Chase v. Denny, 130 Mass. 566; Cameron v. Marvin, 26 Kan. 612; 5 Am. and Eng. Ency. Law (2 Ed.), 981, note 1; Long v. Hines, 40 Kan. 216; Barse Co. v. Guthrie, 50 Kan. 467. (5) As neither Gillett nor Baumbaugh owned or had possession of the T and C cattle, described in the mortgage under which we claim, on October 4, 1898, the time of the execution of the mortgage by Baumbaugh to the A. J. Gillespie Commission Company, and possession was not delivered to the mortgagee at the time, said mortgage last named was absolutely void as against all subsequent purchasers and creditors, under the statutes and decisions of Kansas. Section 1, ch. 120, G. S. Kansas, 1897; sec. 3, ch. 112, same; Swigart v. Dodson, 38 Kan. 702; Frankhouser v. Fisher, 54 Kan. 738; Cameron v. Marvin, 26 Kan. 612; Smith v. Etley, 55 Kan. 71; Phillips v. Reitz, 16 Kan. 396; Railroad v. Couse, 17 Kan. 571; Long v. Hines, 40 Kan. 216; Barse v. Guthrie, 50 Kan. 467.

*Stewart Taylor* and *C. O. Tichenor* for the Third National Bank of Springfield, respondent.

This bank claims under a chattel mortgage executed by Baumbaugh dated October 4, and recorded October 6. The others claim under mortgages dated October 14, executed by Gillett. The first one covers four bunches of cattle, the Clark or J. M., the Thompson, the Gangner and the St. Amand. The first were bought August 10, by Gillett, who was to pay a mortgage on the same nearly equaling their cost, and all that remained to be done at that date was the payment of the purchase money and the delivery. The notes in the first mortgage were payable to the Gillespie company which took up the mortgage on the J. M. cattle on October 3, and repaid itself from the sale of the Baumbaugh notes which it sold on October 5 for $24,283.54, which sum about equaled the cost of the four bunches. The J. M. cattle

were delivered to Nail for Baumbaugh October 8, and were put on the latter's farm October 13.   The Thompson, the Gangner and St. Amand cattle were bought by Gillespie in order to comply with his bill of sale of October 4, to Baumbaugh, and as he agreed to do, on the 9th, 11th and 13th of October, respectively; they were never in Gillespie's possession, but were delivered direct to Nail for Baumbaugh and prior to October 14. Under the statutes of Kansas, where these mortgages were made, a sale was good without a delivery. Railroad v. Couse, 17 Kans. 571.   Such a sale was good at common law.   Briggs v. United States, 143 U. S. 354.   A sale of goods to be delivered in the future is good in Missouri.   Crawford v. Spencer, 92 Mo. 505.   And if the sale to Baumbaugh was valid, others can not attack his mortgage.   And when delivered in pursuance of this kind of a contract and in accordance with its terms, the vendee must accept.   Water & Light Co. v. City, 140 Mo. 157.   A purchaser is charged with notice of every fact shown by the records and is presumed to know every other fact which an examination suggested by the records would have disclosed.   Bank v. Freeman, 171 U. S. 629; Shaffer v. Pickrell, 22 Kan. 434; Howard v. Bank, 44 Kan. 549; Britain Dry Goods Co. v. B. S. & R., 60 Kan. 263.   These cattle were never in Gillett's possession; were bought for Baumbaugh and were delivered to him; they could not have been seized under an execution or attachment against Gillett.   Love v. Jones, 4 Wall. 470; Bank v. Bank, 50 Mo. App. 95; Cameron v. Marvin, 26 Kan. 612; Walker v. Vaughan, 33 Conn. 584; 2 Sumner 531; Rutherford v. Stewart, 79 Mo. 216; France v. Thomas, 86 Mo. 80; King v. Graves, 51 Mo. App. 544.   The acquisition of the property and the execution of the mortgage may be parts of the same contract and so nearly connected in point of time as to become parts of the same transaction. France v. Thomas, 86 Mo. 80; Stewart v. Smith, 36 Minn. 83. The character of the transaction must be determined by the intention of the parties to it.   King v. Graves, 51 Mo. App. 544.   An agreement in writing to give a

mortgage or a mortgage definitely executed, or an imperfect attempt to create a mortgage, will create a mortgage in equity.    Martin v. Nixon, 92 Mo. 34; In re Clark, 36 Ch. Div. 356; s. c., 13 App. Cas. 546.    The question of transfer to and vesting title in 'a purchaser always involves an inquiry into the intentions of the contracting parties.    Ober v. Carson, 62 Mo. 21.    Even in this State the delivery of possession to a third party is sufficient.    Irwin v. Arthur, 61 Mo. 387.    In Kansas employment of mortgagor does affect change of possession.    Dolan v. Denmark, 35 Kan. 308; Dayton v. Bank, 23 Kan. 421.    Sharing in profits does not give interest in property.    Ashby v. Shaw, 82 Mo. 81; Drennan v. Life Assurance Co., 113 U. S. 51.    It was proper to consider the whole transaction, bill of sale, mortgage, verbal agreements and payments.    Brown v. Morange, 108 Pa. 75.    If a part of the agreement only is put in writing, matter left out may be supplied by parol.    Black River L. Co. v. Warner, 93 Mo. 384; Plumb v. Cooper, 121 Mo. 676; Life Ins. Co. v. Crevans, 60 Mo. 390; Weeks v. Medler, 20 Kan. 57.    Even if the execution of the mortgage was for the accommodation of Gillett, it was valid.    Moffat v. Green, 149 Mo. 54; Alexander v. Graves, 25 Neb. 453.    If a bill of sale is regular on its face and one is in possession under it, the burden is on him who assails it.    Albert v. Besil, 88 Mo. 150.

MARSHALL, J.—This is a bill in equity by the plaintiff as a stakeholder to require the defendants to interplead for the sum of $14,971.03, in its hands, resulting from the sale of 403 head of cattle, which were consigned to it by the defendants, to be sold by it to the best advantage, and the proceeds to be held by it pending an amicable settlement among the defendants of their respective claims.    They were unable to agree and therefore the plaintiff filed this bill of interpleader to have the claimants litigate their rights.

The defendants interpleaded for the fund.  Pending the determination of the case the parties agreed that instead of paying the money into court, the plaintiff might

retain the fund, paying interest thereon. The trial court adjudged the fund to the Third National Bank of Springfield, Massachusetts, and the other defendant banks and Elmore & Cooper appealed.

The abstract of the record embraces five hundred and twenty-five printed pages. The briefs of counsel aggregate two hundred and seventeen pages. It is manifestly impossible, therefore, within the limits proper to be observed in any opinion, to give even an outline of the testimony, documentary evidence, and circumstances, adduced upon the trial. Time and space admit only of a short, clear statement of the *ultimate* facts disclosed by the record to serve as a basis for the principles of law to be discussed and decided.

Ultimate facts.

Prior to October 3, 1898, Grant G. Gillett, living at Woodbine, Dickinson county, Kansas, was a large stock dealer. Charles H. Baumbaugh, of the same place, was his brother-in-law and for some time had been employed by him as clerk, at a salary of fifty dollars per month. The A. J. Gillespie Commission Company was a corporation, located at Kansas City, Kansas, and engaged in the business of dealing in cattle, and buying and selling notes, secured by chattel mortgages on cattle. Gillett was a stockholder, but not an officer, in the company.

On October 3, 1898, E. R. Clark, of Marion county, Kansas, was the owner of, and had on pasturage in Chase county, four hundred and sixteen head of cattle, four years old, called "*Westerns*" and weighing 1,100 pounds, and branded "J. M." or "⊙," the latter mark being called, "circle dot." Clark had mortgaged these cattle to Elmore & Cooper for about fifteen thousand dollars.

On October 3, 1898, the Gillespie Commission Company, at the request of Gillett, bought, from Elmore & Cooper, the Clark mortgage on said cattle, and carried it as "bills receivable" until October 5th, when it was paid by the proceeds of the "Baumbaugh" mortgage hereinafter described.

On October 4, 1898, Gillett and Baumbaugh went to the office of the Gillespie Commission Company, in Kansas City, Kansas, for the purpose of executing a mortgage on the cattle, covered by the Clark mortgage. Gillett did not want to make the mortgage himself for fear, he said, of injuring his credit. So he arranged with Baumbaugh, that he (Gillett) would give Baumbaugh a bill of sale for the 416 head of cattle, owned by Clark, and Baumbaugh should execute a mortgage on them to the Gillespie Commission Company, and that Gillett should get the proceeds of the mortgage and manage the whole matter, and Baumbaugh should have a half interest in the profits realized. Instead of making the mortgage on the 416 Clark cattle alone, it was agreed that the mortgage should be made to cover six hundred head of cattle, and that Gillett should go out and buy 184 more cattle and add them to the Clark 416 cattle, thus filling the complement of six hundred. Thereupon Gillett executed to Baumbaugh the following bill of sale:

BILL OF SALE.
"Kansas City, October 4, 1898.
"State of Kansas, County of Dickinson, ss.
"This certifies that I have this day sold, assigned and *agreed to deliver* to Charles H. Baumbaugh, eighty-four native four-year-old steers branded T on the left loin; one hundred native four-year-old steers, branded C on the left hip; and four hundred and sixteen western four-year-old steers branded J. M. or ⊙ on left side. The above cattle are all free, clear and unencumbered. Also 20,000 bushels of corn now in crib at Lebanon, Kansas. The consideration paid for the above-named cattle and corn is $24,795.99 which includes $300 commission and $495.99 interest,

"G. G. GILLETT."

Thereupon on the same day, Baumbaugh executed a chattel mortgage to the Gillespie Commission Company to secure the notes aggregating $24,795.99, payable at ninety days. The description of the property

in the mortgage is as follows: "The following steers: eighty-four natives branded T on left loin, four years old and weight 1,150 pounds, also one hundred natives branded C on left hip, four years old and weight 1,200 pounds, also four hundred and sixteen westerns branded ☉ or J. M., four years old and weight 1,100 pounds, also twenty thousand bushels of corn. Said cattle are to be fed on the owner's farm, about one mile north of Herrington, Kansas. Said corn is now in crib at Lebanon, Kansas, and is to be shipped to Herrington, Kansas. When said stock is marked to be consigned for sale to A. J. Gillespie Com. Co., Kansas City Stock Yards, and proceeds applied on notes."

At the time of the execution of the bill of sale and of the mortgage, neither Gillett nor Baumbaugh owned any of the cattle described in those documents. Gillett had an option to buy the Clark 416 head of cattle for $40 a head, but he had not purchased them or paid a farthing thereon. Neither Gillett nor Baumbaugh then owned or had in mind any cattle marked "T & C", nor were there any cattle answering such a description anywhere in existence.

Upon the execution of the notes and mortgage by Baumbaugh they were turned over to Gillett, and by him turned over to the Gillespie Commission Company, and that company on the same day sold the notes and mortgage to the Hocker, Arnold, Woodson Brokerage Company, and after taking out $495.99 for interest and $300 for commissions, passed the balance of the proceeds amounting to $24,000 to the credit of Gillett upon the books of the company. This credit was wiped out by a draft on the company by Gillett, on October 5, 1898, for $16,000 (which was evidently intended to cover what the company had paid Elmore & Cooper for the Clark mortgage on October 3), and by $8,000 cash paid to Gillett on October 10, 1898.

Baumbaugh paid Gillett nothing for the cattle, and received nothing out of the proceeds of the notes and mortgages. He acted in the matter solely to oblige Gillett, and upon his promise that he should share in the

profits.    The bill of sale recites that Gillett "*agreed to deliver,*" the cattle to Baumbaugh, but they were never intended to be delivered and in fact never were delivered at any time to Baumbaugh, but the agreement was that Gillett should have the possession of them, should have his men care for them, should feed them, should market them and should receive the proceeds of their sale.

At the time the mortgage was assigned to the Gillespie Commission Company, that company knew neither Gillett nor Baumbaugh owned or had in their possession any of the cattle described in the mortgage, but the company understood that cattle were to be bought to fill the description in the mortgage.

On October 5, 1898, the Gillespie Commission Company sold and assigned the notes and mortgage to the Hocker, Arnold, Woodson Brokerage Company, and informed that company at the time of the fact that neither Gillett nor Baumbaugh owned the cattle therein described but they expected to buy cattle to fill the description in the mortgage.

On October 15, 1898, the Hocker, Arnold, Woodson Brokerage Company sold and assigned the notes to the Third National Bank of Springfield, Massachusetts, and that company knew nothing of the above recited facts concerning the notes and mortgage, but were innocent purchasers, for value and without notice.

On October 7, Gillett sent his agent, Thomas Kinahan, to Marion county to get the "J. M." and "circle dot" cattle from Clark, and he did get the 416 head from Clark, and drove them from the place where they were on pasture, two miles north of Clements, in Chase county, Kansas, which was about thirty miles from Herrington, Dickinson county, and with Clark's assistance and that of his men the cattle were driven to the Mosier farm, which was about a mile south of Herrington, arriving there on Sunday, October 9, 1898, where they were turned over to David Naill.    The Mosier farm was owned by Gillett and was leased by him to Naill, and Naill was employed by Gillett to care for

and feed the cattle. About a week after such delivery to Naill, Gillett paid Clark the difference between the price of the cattle, at forty dollars a head, and the amount of the Clark mortgage to Elmore & Cooper, that the Gillespie Commission Company had bought, at the request of Gillett, and which that company had charged against Gillett's account on the 5th of October.

On October 7th, Gillett purchased sixty-three head of cattle from J. L. Thompson. They were delivered to Naill, as agent for Gillett, on October 8th, and were put in what is called the "Schoolhouse Pasture," which was owned by Naill, and was located about three quarters of a mile northeast of the Mosier farm.

On October 11th, Gillett purchased thirty-seven cattle from St. Amand, of Herrington, Kansas, and they were on that day delivered to Naill, for Gillett, and were placed in the said schoolhouse pasture.

On October 13th, Gillett purchased one hundred cattle from Gangwer, of Delavan, Kansas, and they were also delivered on that day, to Naill, for Gillett, and were placed in the said schoolhouse pasture.

When these three lots of cattle were placed in the schoolhouse pasture, the parties have agreed that they were massed as one herd and all branded "T & C."

On October 10th, these "T & C" cattle were taken out of the schoolhouse pasture and placed in pens which lay partly in and partly outside of Herrington, and were known as "Gillett's stockyards," or "Gillett's feed pens" or "Gillett's corral."

Gillett had owned the land and had built the feed pens. He put the paper title in Baumbaugh, but whether Gillett or Baumbaugh was the real owner is not clear, nor is it material, for Gillett used the land and feed pens as he pleased and put cattle in the pens and took them out again, without consulting Baumbaugh.

At the same time, to-wit, October 13th, Gillett moved the J. M. and circle dot cattle (the Clark cattle) from the Mosier farm and put them also in the said stock yards.

Thus on October 14th, Gillett had in his possession in his feed pens at Herrington, Kansas, six hundred head of cattle.

On October 14, 1898, Gillett executed to Elmore & Cooper three notes secured by three separate chattel mortgages, as follows:

*First.* A note for $7,000 due in 150 days. The mortgage securing this note described the property as follows:

"The following described property in said county [Dickinson]: 200 head, 4 year old western dehorned steers, branded ⊙ and a heart on left side. These cattle were wintered in Kansas last winter and weighed 1,000 pounds. These cattle are in my feed lot in the town of Herrington, and will not be removed therefrom until shipped to Elmore & Cooper, Stock Yards, Kansas City, Missouri. These cattle were bought from E. R. Clark, of Marion, Kansas. I also include in this mortgage 8,000 bushels of corn, together with all increase thereof."

This note and mortgage was sold by Elmore & Cooper to the State Bank of St. Louis, before maturity for value and without notice, and that bank is the innocent holder thereof, and this is the claim asserted in its interplea.

*Second.* A note for $7,490 due in 150 days. The mortgage securing this note described the property as follows:

"The following described property in said county [Dickinson]: 214 head, 4 year old western dehorned steers, branded J. M. on left side. These cattle were wintered in Kansas last winter, and weighed 1,000 pounds. These cattle are in my feed lot in the town of Herrington, and will not be removed therefrom until shipped to Elmore & Cooper, Stock Yards, Kansas City, Missouri. These cattle were bought from E. R. Clark, of Marion, Kansas. I also include in this mortgage 8,000 bushels of corn, together with all increase thereof."

This note and mortgage was sold by Elmore &

Cooper to the First National Bank of Omaha, before maturity, for value and without notice, and that bank is the innocent holder thereof, and this is the claim asserted in its interplea.

*Third.*  A note for $8,000 due February 11, 1899. The mortgage securing this note describes the property as follows:

"The following described property in said county [Dickinson]: 200 native steers, branded 100 T on left hip and 100 C on left hip; 63 of these cattle were bought from J. L. Thompson, of Herrington, Kansas, weight 1,200 pounds; 37 were bought from L. St. Amand of Herrington, Kansas, weight 1,050 pounds; 100 was bought from Gangwer, of Delavan, Kansas, and weigh 1,050 pounds. These cattle are on full feed in my lot at Herrington and will not be removed from there until shipped to Elmore & Cooper, Stock Yards, Kansas City, Missouri. I also include 8,000 bushels of corn in this mortgage, together with all increase thereof."

This note and mortgage was sold by Elmore & Cooper to the Northwestern National Bank of Chicago, before maturity, for value and without notice, and that bank is the innocent holder thereof, and this is the claim asserted in its interplea.

All three of these mortgages contained a provision that if the mortgagees deemed themselves insecure at any time then the indebtedness should become due immediately, at the option of the mortgagees, and they might take possession of the cattle and sell them.  These three mortgages were duly recorded on October 18, 1898.

Thereafter Gillett sent Kinahan, with an order to Naill, to deliver him 216 of the cattle, covered by these mortgages, and Naill delivered them to Kinahan, and he shipped them to St. Joseph, Missouri, where they were sold, and Gillett got the proceeds of the sale and appropriated them to his own use.

On November 1, 1898, Gillett left the country and went to Mexico, leaving obligations amounting to over a million dollars.

The holders of the three mortgages of October 14th, deeming themselves insecure by reason of the absconding of Gillett, elected to declare their debts due, and took possession of the cattle, or rather of all the cattle covered by their mortgages except such as Gillett had sent to St. Joseph and sold. Thereupon it developed that the Third National Bank of Springfield, Massachusetts, held the Baumbaugh mortgage of October 4th, which purported to cover all the cattle, and that the State Bank of St. Louis, the First National Bank of Omaha and the Northwestern National Bank of Chicago held the three separate mortgages executed on October 14th, by Gillett to Elmore & Cooper. The parties therefore agreed to consign all the cattle to the plaintiff and have it sell them and hold the proceeds until the claimants could settle their conflicting claims. Failing so to do, the plaintiff filed this bill of interpleader as hereinbefore set out.

It is proper to say further that the Baumbaugh mortgage contained no express provision making the mortgage apply to after-acquired cattle, but purported to operate instantly upon the cattle described in the mortgage.

## I.

This is a case wherein one of two innocent parties must suffer. The four banks claiming the funds are innocent holders, for value and without notice. The Springfield bank claims under the Baumbaugh mortgage, while the St. Louis, Chicago and Omaha banks claim under the Gillett mortgage. The Baumbaugh mortgage was executed on October 4, 1898, and recorded on October 6th. The Gillett mortgage was executed October 14th and recorded October 18. Both mortgages purport to cover the same cattle. The Springfield bank acquired the Baumbaugh mortgage from the Hocker, Arnold, Woodson Brokerage Company, on October 15. The Chicago bank acquired the Gillett mortgage, held by it, on October 20, 1898. The St. Louis bank acquired the Gillett mortgage, held by it, on October 19, 1898. The

Omaha bank acquired the Gillett mortgage, held by it, on a date not definitely stated. The claim of the Springfield bank is therefore prior in point of time to the claims of the St. Louis, Chicago and Omaha banks. But the decisive question in the case is, which is prior in right?

The Baumbaugh mortgage was executed on October 4th. The effectiveness of that mortgage to bind the property mortgaged is the first question in the case. When this mortgage was made Baumbaugh did not own a single head of cattle in all the world, so far as the record shows, and had no title whatever to any of the cattle described in the mortgage. Indeed, as far as the one hundred and eighty-four head, marked "T & C" are concerned, there were at that time no such cattle in existence. Baumbaugh's title to the cattle described in his mortgage depends entirely upon the bill of sale from Gillett to him. At that time Gillett had no title to a single head of the cattle described in the bill of sale. The four hundred and sixteen head described in the bill of sale as marked "J. M." and "circle dot," belonged at that time to Clark, and the A. J. Gillespie Commission Company held the mortgage on them for over fifteen thousand dollars, which Clark had given to Elmore & Cooper, and which the Gillespie Company purchased from Elmore & Cooper on October 3d. But Gillett had no title to them whatever. He had an option on them, which required him to pay off the mortgage on them and pay the balance of the agreed purchase price of forty dollars a head, to Clark, but at the time he made the bill of sale to Baumbaugh, Gillett had not paid one cent on account thereof. At his request the Gillespie Company bought the mortgage on October 3d, but that was not Gillett's purchase, no money of his was used for that purchase, and that company carried the note and mortgage as "bills receivable" due that company. The legal title to the property and the possession of the property was in Clark at that time. The bill of sale recites on its face, not an intent to presently

deliver possession of the cattle to Baumbaugh, but instead an agreement to deliver such possession thereafter, at a time not specified. At that time the 184 head of T & C cattle were not even in existence, and neither Gillett when he made the bill of sale nor Baumbaugh when he made the mortgage had any particular cattle in mind as filling this description, but Gillett intended to buy cattle somewhere and brand them T & C to fill the call of the bill of sale and mortgage. It is to be noted, however, that no such intention is even hinted at in either the bill of sale or in the mortgage, but on the contrary both of those instruments purport to operate instantly upon a subject-matter then assumed to exist. After the note and mortgage were made Baumbaugh turned them over to Gillett, and Gillett turned them over to the Gillespie company and on the next day, October 5th, the Gillespie company sold them to the Hocker, Arnold, Woodson Brokerage Company. Then on October 5th the Gillespie company used part of the proceeds of this sale to pay off the Clark mortgage which it had acquired from Elmore & Cooper, and on the 10th of October it turned over the balance of such proceeds to Gillett, and out of such balance Gillett paid Clark what remained due to him, and then, with the amount remaining of such proceeds, he purchased the one hundred and eighty-four head from Thompson, Gangwer and St. Amand, and marked them "T. & C."

Thus it will be seen that neither Gillett nor Baumbaugh ever put a cent of their own money in any of these cattle. On the contrary all of the money that went to pay for the cattle was raised by the Baumbaugh mortgage, and the proceeds of that mortgage arising from a sale thereof to the Hocker, Arnold, Woodson Brokerage Company, paid for all the cattle. It must be observed that when the Brokerage company took the Baumbaugh mortgage it was informed by the Gillespie company that the mortgagor did not have any such cattle as he was attempting to mortgage. The Springfield bank, however, had no knowledge of this state of affairs.

The sum of the matter, therefore, is this: Gillett gave Baumbaugh a bill of sale for cattle he did not own, never paid a cent for, and did not have possession of and a part of which had no existence, but which he agreed to deliver, and for which Baumbaugh never paid or agreed to pay him a cent; Baumbaugh executed a mortgage on cattle he never paid a cent for, never owned and never had possession of. Neither the bill of sale nor the mortgage attempts in any way to affect or cover after-acquired property. The question, then, is, what title to the cattle was conveyed by the Baumbaugh mortgage?

It is a fundamental rule of the common law that nothing could be mortgaged that was not in existence at the time of the mortgage and did not at the time belong to the mortgagor. And this rule obtains in nearly all of the States of the Union. [5 Am. and Eng. Ency. Law (2 Ed.), p. 979, and cases cited in notes.] This is the rule in Kansas where the mortgages in question in this case were made. [Long v. Hines, 40 Kans. 220.] In this case the Supreme Court of Kansas quotes the language of Chief Justice SHAW, in Barnard v. Eaton, 56 Mass. 294, who said: "A mortgage is an executed contract; a present transfer of title, although conditional and defeasible; it can therefore only bind and affect property existing and capable of being identified at the time it is made; and whatever may be the agreement of the parties, it can not bind property afterwards to be acquired by the mortgagor."

The Supreme Court of Kansas, however, pointed out that in Cameron v. Marvin, 26 Kan. 612, it was said: "The next question is, with reference to the rights of the parties to the property acquired by Patterson after the execution of all the mortgages. Of course this property was not included in the mortgages at the time of their execution. In fact, it could not have been included in the mortgages at that time, for it is not within the power of any person to mortgage property which does not exist or which does not belong to him. He can not mortgage property which is after-

wards to be created, or purchased, or procured. He can only mortgage property which at the time is in existence, and to which he has a title. Parties may make contracts with reference to future-acquired property, and contracts which will be legal and valid and will be upheld; but such contracts do not constitute chattel mortgages. They are simply executory contracts, to be performed in the future; and while they are binding upon the parties making them, they are void as to third persons who have no notice respecting them. They can never be treated as chattel mortgages affecting third persons. Such contracts, however, are always held valid as though they were chattel mortgages, as against third persons who have not in the meantime obtained any specific interest in the property when the mortgagee has obtained the possession of the property under the contracts. When a mortgagee takes possession of the future-acquired property under such a stipulation in the mortgage, he then holds the property by way of pledge, but in the same manner as though the mortgage had been executed at the time he takes the possession of the property, and in the same manner as though he had taken the property under and by virtue of a chattel mortgage covering the property.''

The rule in Kansas is that to affect the after-acquired property the mortgage must contain an express provision binding such after-acquired property, and even where there is such an express provision in the mortgage the rights of third persons are not affected thereby unless the mortgagee takes actual possession of the after-acquired property before it is purchased by third persons or seized by creditors, and that if such third persons purchase it or such creditors seize it before the mortgagee takes such actual possession thereof, the third persons or creditors obtain the better right thereto. [Dayton v. Bank, 23 Kans. 421; Cameron v. Marvin, 26 Kans. 612; Live Stock Co. v. Guthrie, 50 Kans. 1. c. 474-5.]

The case of Brittain Dry Goods Co. v. Blanchard et. al., 60 Kans. 263, is relied on by the Springfield bank.

as an analogous case to the case at bar, but this is a misapprehension. In that case it appeared that one Foltz was indebted to the plaintiff, the Brittain Dry Goods Company. The debt was unsecured. Foltz desired to buy a herd of cattle. He obtained the money so to do from the defendants, Blanchard et al., agreeing to buy the cattle, take them to his farm, and to secure Blanchard by giving a bill of sale of the cattle to a man in his (Foltz's) employ, and have the man execute the notes and mortgage. This scheme was resorted to because Foltz was president of the bank and it was feared it would injure the credit of the bank if Foltz executed the mortgage. The arrangement was carried out literally except Foltz did not give the bill of sale to his employee, who executed the note and mortgage to Blanchard. The plaintiff attached the cattle and claimed that the mortgage was fraudulent. It was held to be a good mortgage. But it is readily seen that that case is wholly unlike the case at bar. The following essential differences exist between that case and the case at bar: *first*, there Foltz owned the cattle and was in possession of the cattle at the time the mortgage was executed, whereas here, Baumbaugh never owned the cattle and never was in possession of the cattle at any time, and even if the mortgage here be regarded as the mortgage of Gillett and not of Baumbaugh, still this case is unlike that case, because Gillett did not own the cattle when the mortgage was given, nor was he in possession of any such cattle at that time, and as to one hundred and eighty-four of them they were not even in existence at the time the mortgage was executed. *Second.* There Foltz had title to the property which he could convey by the bill of sale or by the mortgage executed by him in the name of and through his employee, whereas here Gillett had no such title. *Third.* There the property was all the time in Foltz's possession, whereas here the property was not in Gillett's possession until several days after the Baumbaugh mortgage was executed. *Fourth.* There there was no question as to after-acquired property, but the property was in existence when

the mortgage was executed and could attach at once, whereas, no such conditions exist here. *Fifth.* There the mortgage was attacked as fraudulent, whereas here the question is one of the effectiveness of the Baumbaugh mortgage and the priority of the several mortgages. In addition to this the Supreme Court of Kansas gave no intimation in that case of intention to overrule the doctrine that had been established in the cases cited from that jurisdiction which bear upon the questions here involved. In fact the Brittain-Blanchard case was treated as being so different from the other cases cited herein, that those cases were not even referred to.

The case of Alexander Bros. v. Graves, 25 Neb. 453, is also strongly relied on by the Springfield bank. In that case A purchased a team of horses from B, and executed a chattel mortgage on the team to secure the purchase price. The parties to the transaction were unacquainted, and B supposed that A had given his true name. Subsequently A sold the team in his real name to C, who examined the records and found no mortgage on the team, executed in A's name. B replevied the team from C, and recovered judgment. But it will be observed that this case is not like the case at bar in this important particular, to-wit, at the time A executed the mortgage he was the owner and in possession of the property mortgaged and such property was then *in esse*. Whereas such is not the case here either as to Baumbaugh or Gillett. It is, of course, conceded, that an owner in possession of personal property may execute a valid mortgage in a fictitious name or may procure a valid mortgage to be executed thereon by some one acting in the name of the other but in reality for the true owner, and such a mortgage is perfectly good as between the mortgagor and the mortgagee. But it is not so clear, notwithstanding the decision cited, that such a mortgage will prevail over a mortgage executed in the real name of the owner in favor of another third person, who examined the records and found no mortgage recorded by the true owner on the property. It

is stated in the opinion cited, that no precedent had been found for it. The weight of authority is that a mortgage on personal propery made by one who is not the owner of the property or by the owner in a fictitious name, and placed on record, is not constructive notice to any one dealing with the owner in his true name. The reason of the rule is that such conveyances, in fictitious names or in the name of an agent, lie outside of the chain of title, and therefore impart no notice. This is the rule always as to real property. [Crockett v. Maguire, 10 Mo. 34; Digman v. McCollum, 47 Mo. 372; Tydings v. Pitcher, 82 Mo. 1. c. 384.] And so far as mortgages are concerned the same rule must obtain as to chattels, if any efficacy is to be given to our registry acts. This is the doctrine that prevails elsewhere. [Maier v. Davis, 57 Wis. 212; Mackey v. Cole (Wis.), 48 N. W. 520 (directly in point); Lewis v. Buttrick, 102 Mass. 412; Wade on Notice, secs. 205 and 223.]

Devlin on Deeds (2 Ed.), section 712, quotes approvingly the language of DUNCAN, J., in Keller v. Nutz, 5 Serg. & R. 245, who said: ''If conveyances from one stranger to another would be notice to all the world, miserable would be the situation of the purchaser. The registering act would afford him no protection, because it could give him no notice.'' And in section 713, the same author points out that the record is notice only to purchasers under the same grantor. Cobbey on Chattel Mortgages, vol. 2, section 781, discusses the cases of Mackey v. Cole, 79 Wis. 426, and Alexander Bros. v. Graves, 25 Neb. 453, hereinbefore referred to, and says the Wisconsin case rests upon the better reason, and the author lays down the rule that, ''A mortgage under a fictitious name is void as to third parties dealing with the mortgagor by his true name.'' [Ib., sec. 781.]

In the case of The Mary, 1 Paine 671, it was held that if the owner of a vessel, after having given a bill of sale in the nature of a mortgage, be allowed to remain in possession and act as absolute owner without any change of her register, and he afterwards sells or

mortgages the vessel or gives a bottomry bond, to one who has no notice of the mortgage, the lien of the latter will prevail over the first mortgage.

In this case, therefore, the result is the same whether the mortgage under which the Springfield bank claims be treated as the mortgage of Baumbaugh or that of Gillett acting in the name of Baumbaugh. In either aspect of the case that mortgage was outside of the chain of title under which the St. Louis, Chicago and Omaha banks claim title, and the Springfield mortgage not being made in the name of Gillett, it imparted no notice to Elmore & Cooper when they took the other three mortgages from Gillett. They found Gillett in possession of the cattle. They were not obliged to look for mortgages on Gillett's interest in the cattle in any fictitious name nor in the name of any one for Gillett. No mortgages on the cattle appeared in Gillett's name. Elmore & Cooper were required to inquire no further.

It has already been pointed out that at the time Baumbaugh executed the mortgage now held by the Springfield bank, neither Baumbaugh nor Gillett owned the cattle or was in possession thereof, and that the bill of sale and mortgage dealt with the cattle as *in praesenti* and as *in esse,* and did not attempt to expressly bind any after-acquired cattle. As between the mortgagor and the mortgagee, or Gillett and the mortgagee, the mortgage was sufficient to convey any title they then had and also such as they might afterwards acquire. But as between the mortgagee and subsequent mortgagees, purchasers or attaching creditors that mortgage was not sufficient to cover after-acquired cattle, and as the cattle in this case were all after-acquired cattle by Gillett (never at any time by Baumbaugh) the mortgage executed by Baumbaugh was not sufficient to bind the cattle as against the claims of the St. Louis, Chicago and Omaha banks under the mortgage executed by Gillett to Elmore & Cooper on October 14, 1898. And even if the Baumbaugh mortgage had contained an express provision making it apply to after-acquired property, it would not avail the Springfield bank anything

in this case, because that bank did not take actual possession of the cattle before they were seized and taken into possession by the holders of the Gillett mortgage of October 14th, now and at that time held by the Chicago, St. Louis and Omaha banks.  [Cameron v. Martin, 26 Kans. 612; Long v. Hines, 40 Kans. 220; Rochester Distilling Co. v. Rasey, 142 N. Y. 570; Low v. Pew, 108 Mass. 347; Tapfield v. Hillman, 6 Manning & G. 245; Head v. Goodwin, 37 Me. 181; Montgomery v. Chase, 30 Minn. 132; Pennock v. Coe, 23 How. 117; Tiffany on Sales (Ed. 1895), 24; 20 Am. and Eng. Enc. Law (2 Ed.), p. 916.]

Jones on Chattel Mortgages (2 Ed.), sec. 138, says: "At common law, a mortgage can operate only on property actually in existence at the time of giving the mortgage, and then actually belonging to the mortgagor, or potentially belonging to him as an incident of other property then in existence and belonging to him. A mortgage of goods which the mortgagor does not own at the time of making the mortgage, though he may afterwards acquire them, is void in respect to such goods as against subsequent purchasers or attaching creditors." And in speaking of a right to mortgage a potential interest the author in section 140, says:  "Thus, to use illustrations familiar since the time of Chief Justice HOBART, 'Land is the mother and root of all fruits. Therefore, he that hath it may grant all fruits that may arise upon it after, and the property shall pass as soon as the fruits are extant.  A person may grant all the tithe-wool that he may have in such a year, yet perhaps he shall have none; but a man can not grant all the wool that he shall grow upon his sheep that he shall buy hereafter, for there he hath it neither actually nor potentially.' "

It follows that the Baumbaugh mortgage was void as to third persons, subsequent purchasers, mortgagees and creditors, because neither Baumbaugh nor Gillett owned any of the cattle covered by it when it was executed, nor were they apparent owners in possession, nor had they any potential interest therein.  It also follows

that while such mortgage was sufficient as between them and the mortgagee to cover after-acquired cattle, it was not sufficient to bind such after-acquired property as against the subsequent mortgagees, the St. Louis, Chicago and Omaha banks. And this is true both because the Baumbaugh mortgage did not in express terms apply to after-acquired property and because the mortgagee therein did not take actual possession of such after-acquired property before the liens and rights of the subsequent mortgage attached.

This conclusion makes it unnecessary to consider the other questions raised. The judgment of the circuit court is reversed and the cause remanded with directions to enter judgment in favor of the interpleaders, the Northwestern National Bank of Chicago, the State Bank of St. Louis, and the First National Bank of Omaha, each for the portion of the fund arising from the sale of the part of the cattle covered by its mortgage, if such proceeds can be followed into the fund and be distinguishable from the balance of the fund, and if this can not be done, then to enter a decree dividing the fund among these three banks in the proportion that their respective claims bear to the total fund, and to enter a decree against Charles H. Baumbaugh for all costs, with a proviso that if they can not be made out of him, then against each interpleader for the costs incurred by each.

All concur.