THE GEORGE R. BARSE LIVE STOCK AND COMMISSION COMPANY *et al.* v. W. W. GUTHRIE.

CONVERSION — *Excessive Judgment — Reversal.* Where an action is brought for the wrongful conversion of live stock, and it appears from the record that plaintiff obtained judgment for the value of a greater number of animals than he had any right to or interest in, the judgment will be reversed, and a new trial granted.

*Error from Morris District Court.*

ACTION by *Guthrie* against the *George R. Barse Live Stock and Commission Company* and others, to recover for the wrongful conversion of live stock. Judgment for plaintiff. Defendants bring error. The material facts are set forth in the opinion.

*Maloy & Kelley,* and *Hutchings, Keplinger & Miller,* for plaintiffs in error:

1. There was not the slightest justification in the pleadings or in the evidence for the rendition of a judgment in favor of plaintiff for more than 50 head of cattle.

2. The plaintiff was not entitled to recover for any portion of the 60 head of cattle. Upon what theory can it be urged that defendant is chargeable with constructive notice

of a mortgage executed by Elliott on cattle which belonged to Chase until the day after such mortgage had been recorded? A party need never search records of a date earlier than the time his grantor first got title to look for incumbrances made by his grantor. Wade, Notice, 214; 2 Pom. Eq. 658.

The fact that the title never reached Elliott was an insuperable bar to his giving any mortgage. *Hallowell v. Milne*, 16 Kas. 65. See, also, Jones, Ch. Mortg. 138, 157, 173*a*.

*W. W. & W. F. Guthrie*, for defendant in error:

There is no case-made here for review other "than upon the exceptions taken by the defendants below upon the trial to the introduction of improper evidence on the part of the plaintiff, or the rejection of proper evidence on the part of the defendant upon the trial." Only upon exceptions to findings stated by the court, upon the trial of questions of fact, can questions of law involved in the trial be the subject of review in this court. See Civil Code, § 290; *Major v. Major*, 2 Kas. 337; *Cowling v. Greenleaf*, 33 id. 570; *Higby v. Ayres*, 14 id. 331; *Hyde v. Bledsoe*, 9 id. 399; *Bixby v. Bailey*, 11 id. 359; *Wilson v. Lightbody*, 29 id. 446; *Stout v. Townsend*, 32 id. 423.

Where the vendor undertakes to convey to the vendee the perfect title, and had not the full title at the time of such conveyance, but afterward acquires it, the full title will thereon immediately pass to the vendee, and be as effective as if the full title had existed at the time of the conveyance. Comp. Laws of 1879, ch. 22, § 5. It is the rule of the common law in equity, and so applicable in this case. 3 Pom. Eq. Jur., §§ 1235, 1236, 1238, 1288; Jones, Chat. Mort., §§ 157, 170, 171, 172*a*, 173, and note; *Scharfenburg v. Bishop*, 35 Iowa, 65; *McCaffrey v. Woodin*, 65 N. Y. 459; *Gregg v. Sanford*, 17 Ill. 17; *Cameron v. Marvin*, 26 Kas. 25–27.

There was no mixing of chattels nor want of description in plaintiff's mortgage. His mortgage covered "102 head of feeding steers," partly on two farms near by, on both of which there was feed, and providing that the steers should be

fed on the two farms, so that the stock should get the greatest benefit therefrom. *Muse v. Lehman,* 30 Kas. 715.

The money furnished by the Barse company to Elliott was a loan, and so intended at the time; and such fact is shown by the concurrence of a number of circumstances all pointing to that conclusion.

There can be no more question of the regularity of the judgment if for 60 head of cattle, than had the judgment been for 50 head. The statement of the petition that "Elliott represented to the plaintiff that such steers, to the amount of 50 head thereof, were on said Millard farm, and that others, to the amount of 60 head in all, then belonged to him, and would be gathered up and placed on said Millard farm within a few days, and as soon as the same could be reasonably done," does not state "that Elliott never promised to give any mortgage on more than 50 cattle," for he did mortgage 102 head of feeding steers, a part represented to be at the home place, and a part at the Millard farm, and with nothing necessary to be added thereto to make the number 60; and which promise was in fact executed two days before the defendants had the right to set up any lien by virtue of their instrument of September 17; and whether the 10 steers added to the Millard bunch came from the home bunch, or were gathered up from other steers belonging to Elliott, would cut no figure, either in the matter of description or ownership; "the mortgage covers, and was intended to cover, 60 head of steers and 84 hogs, to be fed on the Millard place," and this was the plaintiff's claim.

The opinion of the court was delivered by

JOHNSTON, J.: This was an action brought by W. W. Guthrie against the George R. Barse Live Stock and Commission Company, J. H. Simcock, and the Emporia National Bank, to recover for the wrongful conversion of 60 head of steers, of the alleged value of $2,500, and 84 hogs, valued at $1,050. The plaintiff below based his claim to the cattle and hogs upon a chattel mortgage executed by Anson Elliott

on September 11, 1888, and which was filed for record two days later. Elliott was then engaged in the business of farming and feeding cattle and hogs, in Morris county, and was in possession of two farms, one known as his "home place," and the other as the "R. J. Millard farm." About two years before that time, Elliott became indebted to Guthrie for cattle purchased from him; and about the 9th of September, 1888, Guthrie, learning that Elliott's financial affairs were in bad condition, proceeded to Morris county, and obtained from Elliott, as security upon the indebtedness, a mortgage on horses, mules, cattle, hogs, crops, and feed, which Elliott claimed to own, and most of which were then in his possession. The indebtedness amounted at that time to the sum of $3,364.50, and it was then extended, and made payable in installments—$500 October 1, 1888; $1,000 January 1, 1889; $1,000 February 1, 1889; and $864.50 May 1, 1889. Among other chattels described in the mortgage were 84 head of feeding hogs, then "in the corral on the R. J. Millard farm," and also "102 head of feeding steers, two and three years old, 52 head being on the home place and 50 on the Millard place." At the time the mortgage was executed, the hogs were actually upon the R. J. Millard place, and in the possession of Elliott; but there were no steers upon the Millard place at that time, nor for several days afterward. The George R. Barse Live Stock and Commission Company, claiming to be the absolute owner of the steers and hogs, took possession of the same about the 17th of November, 1888, and, a few days afterward, sold the same and appropriated the proceeds to their own use. Guthrie then began this action, and in his petition set forth the indebtedness of Elliott to himself, the execution of the mortgage, and made a copy of the same a part of his petition. He averred that the 84 hogs were actually owned by Elliott, and were in fact on the Millard place on September 11, 1888, but that the "60 head of steers at said time had not been acquired by said Anson Elliott, but were so acquired by him on and after, and between September 1 and 11, 1888, by purchase thereof by said Elliott and for his account as the owner

thereof." As to the steers mentioned in the mortgage, he alleged that —

"The said 50 head of steers were not in fact at said time on said farm, but had been bargained for and purchased, and were in fact owned by said Elliott, and he was then entitled to and in fact in the possession thereof, by virtue of his contracts for purchase thereof, and then having in fact the equitable title thereto to the extent of the value thereof, and which was the case in fact as to the certain 60 head of such steers between said time and September 17, 1888, in fact by said Elliott placed on said R. J. Millard farm as the owner thereof, and then and thereafter in possession as such owner, until as hereinafter stated; but on said September 11, 1888, said Elliott represented to the plaintiff that such steers to the amount of 50 head thereof were on said Millard farm, and others thereof to the amount of 60 head in all belonged to him and would be gathered up and placed on said Millard farm within a few days, and as soon as the same could be reasonably done; and upon which representations the plaintiff had the right to and did rely in accepting such chattel mortgage and thereon extending credit to said Elliott, and which said 60 head of steers were then and thereafter worth fully the sum of $2,500; . . . and the plaintiff, by virtue of such chattel mortgage, had the first and valid chattel-mortgage lien thereon, and thereby a legal title thereto."

The petition further sets forth an agreement between the live stock commission company and Elliott, made on September 17, 1888, which recites that the company is the owner of the cattle and hogs placed upon the Millard farm, and that they were to be fed and cared for by Elliott without any expense to the company, and that all profits over and above the purchase price, and interest on the same at the rate of 12 per cent. per annum, together with the commission for buying and selling the stock, should be applied on the indebtedness of Elliott to the company. The agreement was filed for record in the office of the register of deeds on September 28, 1888, and it is alleged that the agreement was in fact a security in the nature of a chattel mortgage upon the cattle and hogs, and was drawn up in the form mentioned with the fraudulent intent of defeating the plaintiff below, and that

instead of its being an evidence of the ownership of the company it was —

" In fact at the most but chattel-mortgage security to said George R. Barse Live Stock Commission Company, subordinate to the plaintiff's chattel-mortgage security."

The defendants below denied any fraudulent purpose or any attempt to conceal from plaintiff the real character of the transaction between Elliott and itself, and alleged that the steers and hogs were the absolute property of the company before Guthrie's mortgage was executed. A trial was had without a jury, and the court made a general finding in favor of Guthrie, and awarded him judgment against the George R. Barse Live Stock Commission Company and J. H. Simcock for $3,528, the full value of the steers and hogs alleged to have been wrongfully converted.

It is contended by plaintiffs in error that the testimony does not sustain the finding and judgment of the court. As to the sufficiency of the evidence to sustain the finding of Guthrie's right to recover for the hogs, there can be little question. It is true that the plaintiffs in error show that Elliott was largely indebted to them, and they offer considerable evidence tending to show that a settlement was had between the company and Elliott in May, 1888, in which Elliott gave the company a mortgage on his real estate, and also upon his growing crops, and provided that when the crops were matured the company was to place upon Elliott's premises cattle and hogs, to which the crops should be fed, and when they were fattened the company was to sell them, take out the money paid for the stock, and allow it on Elliott's indebtedness; and that in pursuance of this arrangement the hogs were purchased for the company, and the price of the same was paid to Elliott by Simcock about the time the hogs were put on the Millard place. The written agreement made on September 17, 1888, when all the hogs and cattle had been brought in and placed on the Millard place, was substantially what was claimed to have been agreed upon in the preceding May, and tends to confirm the theory of the company. On

the other hand, it appears that the hogs were purchased by Elliott, and he testified that he purchased them for himself, and paid for them with his own money, and that the $1,000 handed him by Simcock on September 10 was a loan to him, to make good his bank account, which was then over-drawn. The company had previously loaned money to El-liott with which to purchase stock and allowed him to retain the title to the same in himself, and he testified that he un-derstood the money was furnished to him in this instance the same as before. A portion of the hogs which he purchased and shipped to Dunlap were sold by him before they were placed on the Millard farm, and as they were on that farm and in his possession when he executed the mortgage to Guthrie, it is clear that there is abundant evidence to sustain the finding of the court that there had been a wrongful con-version of the hogs.

The finding and judgment awarding a recovery for the con-version of 60 steers cannot be sustained. If the plaintiff be-low is entitled to recover for the steers fed on the Millard farm, such recovery must be limited to those described in the mort-gage upon which he bases his right. While there were 102 head of steers described in the mortgage, 52 of them were de-scribed as being at the home place of Elliott, and these formed no part of the 60 for which a recovery is sought in this action. They had been previously mortgaged to the Emporia National Bank, and it appears from both the pleadings and the evidence that none of them are involved in this controversy. It ap-pears that Elliott did not undertake to give a mortgage to the plaintiff below on more than 50 cattle in addition to those at the home place, and we find nothing in the record which would in any event warrant a recovery for more than 50 head of the steers in controversy. No portion of the 60 head of steers fed upon the Millard place were taken from the home place, and in fact none of the steers were upon the Millard place or in the possession of Elliott at the time the mortgage was executed. Of the 60 head that were placed on the Mil-lard farm, 30 head were purchased from J. B. Moffat, for

$1,100, on the 6th day of September; eight of them were bought on the following day from W. W. Ray, for $265; on the 8th of September, six of them were purchased from Andrew Yokel, for $222; and on the 14th of September, 16 of them were purchased from F. M. Chase.   J. H. Simcock, who was the agent of the company, gave checks to each of the owners from whom the cattle were purchased in payment for the same, and the cattle were gathered up by Elliott and placed on the Millard farm about the 15th of September, four days after the execution of the Guthrie mortgage.   The Chase cattle had not been bargained for by either Elliott or Simcock at the time the mortgage was executed, and Elliott was not present when the Ray and Yokel cattle were purchased, and had no connection with them until they were gathered up to be placed on the Millard farm.   He testified, however, that Simcock was acting for him in the purchase of these cattle, and that the money advanced for the payment of the same was a loan to him, to be repaid when the cattle were fed out and marketed.   He stated that he negotiated the purchase of the Moffat cattle and the Chase cattle, but it appears that the Chase cattle were not bargained for by either Elliott or Simcock until several days after the execution of the mortgage.

The question respecting the ownership of the cattle is very contradictory, and the district judge has settled the conflict so far as the evidence tends to support the ownership of Elliott and his right to mortgage such as he then owned.   If Elliott owned the cattle when the mortgage was executed, Guthrie acquired a lien on as many of them as were sufficiently described, and from such description could be identified. Elliott, of course, could not execute a valid mortgage upon the property of the company nor upon property which was not then owned by him.   A contract to convey or mortgage cattle to which he had no title, but which were afterward acquired by him, although not constituting a chattel mortgage under the law, might become of equal force as between the mortgagor and mortgagee after the mortgagor had acquired title.   Such a transfer might also be valid as to third

persons, if the mortgagee obtained possession of the property before such persons acquired any specific lien or interest therein. (*Cameron v. Marvin*, 26 Kas. 612; *Long v. Hines*, 40 id. 220.) Elliott, however, did not attempt to convey more than 50 of the steers on the Millard farm, and, under the pleadings and evidence, the plaintiff below was not entitled to recover for a greater number. For this reason there must be a reversal of the judgment.

As there will be another trial, we will not undertake to determine upon the evidence in this record as to whether the company was an owner or a mere mortgagee of the stock in question, nor as to whether the knowledge, purpose and conduct of the parties were such as to give Guthrie a valid lien on the stock mentioned in his mortgage. The question whether the steers mentioned in the mortgage are sufficiently described, and as to how many of them can be identified under the description given, must be settled by the testimony received on the new trial, and cannot with propriety be discussed here. If there had been special findings stating the number and value of the hogs alleged to have been converted, the judgment to that extent might have been affirmed; but no special findings were made, and, as the judgment was a general one, there must be a complete reversal, and a new trial.

All the Justices concurring.