THE FIRST NATIONAL BANK OF CONCORDIA, KANSAS, v. THE McINTOSH & PETERS LIVE-STOCK AND COMMISSION COMPANY.

No. 14,430.    (84 Pac. 535.)

SYLLABUS BY THE COURT.

1. CONTRACTS—*Bailment—Sale.* If the owner of cattle deliver them to another to be fed under an express agreement that the only interest of such other person in the cattle is what he may put on them, the transaction is a bailment and not a sale.

2. ———— *Agreement of the Parties—Construction.* Whenever parties themselves define the limits of their rights and obligations in respect to the ownership, custody and care of a herd of cattle the compact controls, and there is no room for the

application of a legal theory which might govern in the absence of an express agreement.

3. CHATTEL MORTGAGES—*Interest of Bailee.* If the bailee of cattle under an agreement like that referred to in paragraph 1 attempt to mortgage his interest in them at a time when they have gained nothing, the mortgage is void for want of a thing to be mortgaged.

4. —————— *Property to be Created or Acquired.* In order that a chattel mortgage may affect property to. be created or acquired by the mortgagor subsequently to the making of the instrument it must expressly declare such to be its purpose, and when the property is brought into existence. or is acquired by the mortgagor the mortgagee must take actual possession of it before the claims of third persons attach.

Error from Wyandotte district court; J. McCabe Moore, judge. Opinion filed January 6, 1906. Affirmed.

*Park B. Pulsifer,* and *Dwight M. Smith,* for plaintiff in error.

*Beardsley, Gregory & Kirshner,* for defendant in error.

The opinion of the court was delivered by

BURCH, J.: The plaintiff sued the defendant for the conversion of a herd of cattle. Judgment was rendered for the defendant upon the following findings of fact and conclusions of law:

## "FINDINGS OF FACT.

"(1) That at the times hereinafter mentioned plaintiff was and still is a national bank located at Concordia, Cloud county, Kansas; that the defendant was and still is a Kansas corporation engaged in the live-stock commission business in Kansas City.

"(2) In the month of October, 1902, A. W. Miller was the owner of seventy (70) head of cows and heifers. H. J. Eppler was the son-in-law of said Miller, and resided at the time on a farm belonging to the said Miller in Cloud county, Kansas; that the said seventy (70) head of cattle were, some time during the month of October, 1902, delivered by said Miller to

said Eppler under the following agreement, viz.:
Miller was to remain the owner of the cattle; Eppler
was to have possession of them, and have, as his, what-
ever he added to them in weight or value.   There was
no agreement on Eppler's part that he would feed the
cattle in any amount or for any certain time.   The evi-
dence does not show on what day of the month in
October, 1902, this arrangement between Miller and
Eppler was made, nor the day when the cattle were
delivered by Miller into the possession of Eppler; but
the evidence does show that the cattle were in the pos-
session of Eppler when the mortgage, a copy of which
is hereinafter set out, was given to plaintiff bank.
There was no agreement between Miller and Eppler
which gave Eppler authority to sell said seventy head
of cattle, or to dispose of them or receive the proceeds
from the sale thereof, and Miller at no time consented
that Eppler should have or exercise any such authority
over the cattle.

"(3) On the 22d day of October, 1902, said H. J.
Eppler was indebted to the plaintiff, the First Na-
tionel Bank of Concordia, upon two promissory notes,
one dated November 15, 1901, for $3718.50, on which
there was at that time due about $2058.50, and ex-
tended to January 15, 1903; the other note, dated Oc-
tober 22, 1902, for $316.50, was due January 15, 1903.

"(4) On said 22d day of October, 1902, H. J. Eppler
executed the chattel mortgage to the said First Na-
tional Bank of Concordia, a copy of which is as fol-
lows: [Here follows chattel mortgage.]   There is no
evidence at all that at the time said Eppler executed
said mortgage to the plaintiff bank he had fed to the
cattle in controversy any amount of feed whatever, or
added anything to their weight or value, unless it be
the statement in said mortgage to the effect that the
cattle were 'being fed' by him.

"(5) On the 30th day of January, 1903, said H. J.
Eppler had a public sale on the premises described in
said chattel mortgage, and at said sale the then man-
aging officer of the plaintiff bank was present and
acted as clerk of the sale.   Some cattle were sold;
horses were sold, and also feed, household goods, and
other property.   It was a sale made by Eppler with a
view, at the time known to said officer of the plaintiff
bank, of leaving the state of Kansas and moving from
Cloud county.   The proceeds of the property sold—
cash, notes, and accounts—were kept by the plaintiff

bank in payment of the indebtedness due from Eppler to said bank, and were properly applied and credited on the notes secured by the chattel mortgage above recited, leaving a balance due on the larger note of more than $2200.

"(6) The said managing officer of said bank made no inquiry at the time concerning the seventy head of cattle in controversy here, and in fact did not make any specific inquiry concerning them until after they were sold in Kansas City, as hereinafter recited.

"(7) On the 2d day of February, 1903, said A. W. Miller, with said H. J. Eppler, and their servants, had said seventy head of cattle loaded on cars at Hollis, Kan., a station in Cloud county, Kansas, and shipped consigned to defendant company; at the same time other cattle and hogs were shipped. Part of the shipment was made in the name of H. J. Eppler as consignor, and part in the name of Eppler & Wheeland, as consignors. Miller supposed the cattle were to be shipped in his name, and believed they had been so shipped, and immediately telegraphed defendant company that the cattle had been shipped and requested that the proceeds be credited to his account in the National Bank of Belleville, Kan.

"(8) The defendant company had no actual notice of the existence of the mortgage made by Eppler to the plaintiff bank as aforesaid, or that plaintiff bank had or claimed to have any interest in, or lien upon, said seventy head of cattle or the proceeds thereof. Having been notified by Miller that he claimed the proceeds of the cattle as his own, and demand being made upon defendant by Eppler that the money be paid to him, defendant refused to pay the money to either without the consent of the other, and within a few days thereafter did pay over the money upon the joint draft of the two—that is, said Miller and said Eppler.

"(9) That in all the transactions involving the sale of said cattle and payment of money defendant acted in good faith, without any knowledge at all of any claim on the part of plaintiff bank against said cattle, but paid the proceeds of the entire shipment of cattle and hogs on the joint draft of Miller and Eppler.

"(10) There was due from said H. J. Eppler to the plaintiff bank, at the time the defendant paid over the proceeds of the sale of the seventy head of cattle as

aforesaid, the sum of about $2000 on account of the promissory notes hereinbefore described.

"(11) The seventy-three head of cows and heifers and one bull which were in the shipment hereinafter referred to were sold by the defendant company for the gross sum of $2392.45, from which, by consent of the parties, is to be subtracted the proportionate part of freight, yardage, feed and commissions paid out, which was in the aggregate $168.57, and which, taken from the gross sales of the seventy-four head of cattle, would leave $2223.88; from this subtract the selling price of the bull, and the *pro rata* amount representing the selling price of three of the remaining seventy-three head of cattle, would leave the net amount arising from the sale of the seventy head of cattle $2104.64. At the time Miller turned these cattle over to Eppler they were of the value of $1309.25, which, taken from the sum last above, leaves as the amount to which Eppler is entitled out of the proceeds $795.39, under the agreement, as hereinbefore recited, wherein Eppler was to have simply the amount which he added to the value of the cattle, and this $795.39 represents the added value. Miller furnished $553.66 in feed and in money with which to purchase feed for these cattle.

"(12) Prior to the commencement of this action demand was made by plaintiff of the defendant for the return of the cattle in controversy, which demand was not complied with."

"CONCLUSIONS OF LAW.

"(1) The arrangement between Miller and Eppler, at the time it was entered into, was a mere gratuity on the part of Miller, and amounted to a mere license given to Eppler to take and feed the cattle and have simply the amount which he added to the value of the cattle. There being an entire absence of any proof that, at the time of making the mortgage in controversy, Eppler had fed anything to the cattle or added anything to their weight or value, the court finds that the mortgage in controversy is void as to the defendant herein.

"(2) The mortgage in controversy does not purport on its face to cover any accruing or after-acquired interest of Eppler in the cattle in controversy, and there being an entire absence of proof that at the time of making the mortgage he had any interest, plaintiff cannot take anything under the mortgage.

"(3) On the findings of fact hereinbefore made, the court declares as a conclusion of law that the defendant is entitled to judgment."

It is argued here that the portion of the second finding relating to the ownership of the cattle is unsupported by the evidence; that notwithstanding such finding the transaction between Miller and Eppler was in law a sale, and not a bailment; and that the plaintiff's mortgage was a valid lien upon any future interest which Eppler might acquire in the cattle by virtue of the contract with Miller.

The plaintiff's entire claim to the cattle rests upon the following descriptive provision of its mortgage: "Also my equity in the seventy head of cattle being fed by me, belonging to A. W. Miller." From this it is apparent the plaintiff cannot identify the property sued for except through the instrumentality of a document which unequivocally asserts Miller's ownership.

When the mortgage was given Eppler doubtless understood the full extent of his interest in the cattle. It well may be assumed that both mortgagor and mortgagee desired that the instrument defining their rights should speak the truth. It is not likely that the mortgagee would accept an instrument containing statements less advantageous than the truth would warrant. It would be a matter of great surprise if the plaintiff should take a mortgage expressed to be on Eppler's equity in Miller's cattle if the cattle in fact belonged to Eppler. The acceptance of the mortgage, its retention and its enforcement against other property make up the equivalent of an admission by the mortgagee of the truthfulness of its declarations. Such admission lacks the quality of conclusiveness because the recital in question is merely descriptive and not contractual, but its evidential value is very great, and all of its probative force is opposed to the plaintiff's claim. The only witness who testified directly to the agreement under which Eppler obtained the cattle was

Miller himself.  Together with other testimony, he gave the following:

"Ques.  Was the arrangement between you and Eppler in reference to this seventy head a verbal or written arrangement?  Ans.  Why, it was verbal.

"Q.  Now, you may state in your own language the arrangement between you and Eppler as to this seventy head of cows and heifers; in other words, what interest had you, and what interest did he have, in the cattle?  A.  All the interest that he had in the cattle was just what he put on them; he took the cattle to feed, and what he put on them was all the interest he had in the cattle.

"Q.  You mean by that that the increase in weight and value at the time of sale, over the weight and value at the time you turned them over to him, was to belong to Eppler?  A.  Yes, sir."

The witness was not in the least confused by the effort of examining counsel to relate the question of ownership to that of a division of proceeds following a sale:

"Ques.  At that time, Mr. Miller, what financial interest had you in those cattle—those seventy head of cattle?  By that I mean, what amount of money was to be paid to you before there was to be anything coming to Eppler on this seventy head of cattle?  Ans. The cattle were mine.  Well, there was $1309.25."

A letter written by Miller to the defendant, and introduced in evidence by the plaintiff, is entirely consistent with his testimony and with his claim of ownership:

"Answering yours of the 1st in reference to H. J. Eppler, will say that the seventy head of cows belonged to me.  I furnished the money to pay for them and they cost $1309.25.  Eppler was to have all he put on the cattle, and whatever they sold for above the $1309.25 was his equity.  If there was any mortgage on these cattle, I was not aware of it."

The plaintiff attempts to draw unwarranted inferences from other testimony relating to the computation of the pecuniary shares of Miller and Eppler in

39—72 KAN.

the property, but none of the statements made is incompatible with the court's finding. The following are the strongest:

"Ques. On payment of the sum of $1309.25, who had the remaining interest in the seventy head of cattle? Ans. Well, I suppose Mr. Eppler did.

"Q. You had no other interest, on payment of that amount due? A. Nothing more than I loaned him some money to buy corn with to feed them."

These questions and answers do not even suggest that Eppler owned the $1309.25 interest in the property before that sum was paid to Miller. On the contrary, the implication is that even upon payment of the amount stated Eppler would not become the proprietor of the cattle, but only of the remaining interest, viz., what he had put on them; and indeed this is true, since it was not within the contemplation of the parties that there should be an actual ascertainment and segregation of Eppler's interest until the cattle were marketed. They were bought to be fed and sold. They were bought with Miller's money, and he owned them. The increment only belonged to Eppler. Whenever they were sold Miller was to receive out of the selling price their original cost, and Eppler was to receive the remainder.

There is much in the record to corroborate this view. The evidence all being in the form of writings and depositions, the case is presented here in practically the same aspect as the one which it bore in the district court. (*Cheney v. Hovey*, 56 Kan. 637, 642, 44 Pac. 605.) In such a case the findings of the district court are entitled to consideration, and in doubtful cases its decision may turn the scales in favor of affirmance. (*Robinson v. Melvin*, 14 Kan. 484; *Macfarland v. Buck*, 27 Kan. 783.) If the evidence be conflicting the findings will not be disturbed unless clearly overborne by the weight of the evidence. (*Moore v. Pye*, 10 Kan. 246.) But in many instances evidence of the character described may be canvassed in the same manner

as if the proceedings were original in this court. (*Robinson v. Melvin,* 14 Kan. 484; *Moore v. Pye,* 10 Kan. 246; *Durham v. C. C. & M. Co.,* 22 Kan. 232, 243; *Keith v. Stetter,* 25 Kan. 100, 101; *Woodward, Faxon & Co. v. Clark,* 30 Kan. 78, 2 Pac. 106.) Such a course has been pursued in this cause, with the result that the finding of the district court is fully approved.

Inasmuch as Miller and Eppler agreed that the full extent of Eppler's interest in the cattle should be merely the additional weight he might succeed in producing, the courts are powerless to enlarge that interest. Whenever parties themselves define the limits of their rights and obligations the compact controls, and there is no room for the application of a legal theory to the contrary.

"A special contract of bailment prevails, in determining the liabilities of the parties, as against general principles of law applicable in the absence of express agreement." (*Butler v. Greene,* 49 Neb. 280, 68 N. W. 496.)

It is true that the question of what the legal effect of a provision in a contract may be is one of law. But the law cannot say, for example, that a gratuitous agreement allowing a man the fleeces which he may grow in a year upon the backs of his neighbor's sheep licenses him to supply his table with mutton from the flock. The law cannot override the will of the parties and compel the passing of title when they have agreed otherwise. (*Metropolitan Nat. Bank v. Benedict Co.,* 20 C. C. A. 377, 74 Fed. 182, 185; *Harris v. Coe et al.,* 71 Conn. 157, 41 Atl. 452.)

In this case, if after all of Eppler's feed had been consumed the cattle had gained nothing, he would have had no claim upon them; and if through no fault of his all of them had died, Miller could have recovered nothing from him. He paid nothing, and entered into no obligation to pay. One of the fundamental elements of a sale is wanting. There was no price to be paid and to be received. "A sale, of necessity, implies a

consideration or price." (*The State v. Muntz,* 3 Kan. 383, 386. See, also, *Union Stock-yards & Transit Co. v. Western Land & Cattle Co.,* 7 C. C. A. 660, 59 Fed. 49.) Conceding that Eppler might have been entitled to keep the cattle upon paying to Miller their original cost, he was under no obligation to do so, and could not have been compelled to do so. He held the property at Miller's risk, and not his own.

The plaintiff insists upon the literal meaning and application of the expressions "return" and "restoration" of the property as ordinarily used in distinguishing bailments from sales—the purpose of the parties in this case being to market the cattle after they were fattened. But a sale on the market, instead of an actual return of the property, is a common incident of bailments (24 A. & E. Encycl. of L. 1026), and delivery to a third person by agreement with the bailor, express or implied, satisfies this requirement of the definition of bailment. (5 Cyc. 169.)

The simple statement of the case of *Scott v. Shultz,* 67 Kan. 605, 73 Pac. 903, distinguishes it. The inapplicability of the conditional-sales act of 1901 is shown by the case of *Harris v. Coe et al.,* 71 Conn. 157, already cited, and the argument which in effect reads into the plaintiff's mortgage the words "subject to a verbal mortgage to A. W. Miller" in place of the words "belonging to A. W. Miller" confutes itself.

When Eppler took the cattle he had no interest in them beyond an opportunity, which was not mortgageable. When the plaintiff took its mortgage he had not, so far as the evidence shows, added a pound in weight or a penny in value to the cattle. Therefore, he was still the proprietor of nothing, and the mortgage was void for want of a thing to be mortgaged. The case is analogous in many respects to that of *Robinson v. Haas,* 40 Cal. 474. Robinson delivered to Rood 2000 sheep to be herded and cared for during a period of three years. At the end of that time the original number was to be returned, and the increase was to

be divided equally.   At a time when the original size of the flock had been diminished by several hundred head Rood undertook to sell to Haas.   The court held that the transaction between Robinson and Rood was a bailment, and that because there was no increase Rood had nothing to sell and Haas acquired nothing from him.

"It is not within the power of any person to mortgage property which does not exist or which does not belong to him.   He cannot mortgage property which is afterward to be created, or purchased, or procured. He can only mortgage property which at the time is in existence, and to which he has a title." (*Cameron, Hull & Co. v. Marvin,* 26 Kan. 612, 628.)

(See, also, *Long v. Hines,* 40 Kan. 220, 16 Pac. 339, 10 Am. St. Rep. 189; *Townsend v. Allen,* 62 Kan. 311, 313, 62 Pac. 1008, 52 L. R. A. 323, 84 Am. St. Rep. 388.)

The mortgage did not in terms express a purpose that it should attach to any interest in the property which Eppler might afterward acquire, and if it had done so the plaintiff failed to perfect its inchoate right by subsequently taking possession.

"The rule in Kansas is that to affect the after-acquired property the mortgage must contain an express provision binding such after-acquired property, and even where there is such an express provision in the mortgage the rights of third persons are not affected thereby unless the mortgagee takes actual possession of the after-acquired property before it is purchased by third persons or seized by creditors, and that if such third persons purchase it or such creditors seize it before the mortgagee takes such actual possession thereof, the third persons or creditors obtain the better right thereto.   (*Dayton v. Bank,* 23 Kan. 421; *Live Stock Co. v. Guthrie,* 50 Kan. 467, 474, 31 Pac. 1071.)" (*New England Nat. Bank v. Northwestern Nat. Bank,* 171 Mo. 307, 324, 71 S. W. 191, 60 L. R. A. 256.)

The judgment of the district court is affirmed.

All the Justices concurring.