No. 35,090

THE INTERNATIONAL HARVESTER COMPANY, *Appellee,* v. THE
CHAMPLIN REFINING COMPANY et al., *Appellants.*

(110 P. 2d 779)

Opinion filed March 8, 1941.

*Chesterman C. Linley,* of Cimarron, and *Russell L. Hazzard,* of Dodge City, for the appellants.

*Carl Van Riper,* of Dodge City, for the appellee.

The opinion of the court was delivered by

SMITH, J.: Plaintiff brought this replevin action against the defendants seeking to recover certain property in the hands of defendant J. R. Allen, sheriff of Gray county. The sheriff held the property under a writ of execution issued on a judgment against defendant R. O. Allen in favor of The Champlin Refining Company, plaintiff in another action and third defendant here. The sheriff and the refining company filed general demurrers to plaintiff's petition. The demurrers were overruled and those defendants appeal.

Plaintiff's petition alleged that defendant R. O. Allen, doing business as the Allen Implement Company, was a dealer for the sale of plaintiff's machinery. Plaintiff claimed the property in controversy by virtue of certain contracts with R. O. Allen which it had filed as conditional sales contracts. The sufficiency of the petition as attacked by the demurrers depends entirely upon whether the contracts alleged by plaintiff were sufficient to retain title for plaintiff by way of security as against The Champlin Refining Company, the execution creditor of the dealer R. O. Allen.

Nine contracts were set out in the petition. These contracts were really contracts between plaintiff and its dealer specifying all the particulars as to the manner in which the dealer and plaintiff should

carry on their relationship. The contracts had been entered into in sets of three. One set of contracts was executed on January 13, 1937, another set was executed on December 11, 1937, and the final set was executed on January 11, 1939. Each set included one contract to cover the business of selling cream separators, cultivators, drills, harrows, etc., another contract to cover the business of selling tractors and tractor-drawn machinery, and a third contract to cover the business of selling International trucks. Each set of contracts was to be in force for the ensuing year after the date of execution. All of the contracts were timely filed for record as provided by our conditional sales statute. (G. S. 1935, 58-314.)

The contracts for cream separators, etc., and those for tractors were similar except as to the machinery involved, while the truck contracts differed somewhat in terms from the other two. Each set of contracts was identical with the other sets except as to date.

The provisions pertinent to this controversy in what may be denominated the cream separator contracts, and also those which may be called the tractor contracts, read as follows:

"The undersigned, the purchaser, hereby orders of said company the goods marked as ordered in the list made a part of this contract, and requests that the same be shipped to Allen Impl. Co. at Copeland, Kansas, on or about the date or dates indicated herein.

"In consideration of the acceptance of this order, the purchaser agrees to all the terms, conditions and provisions of this contract, as follows:

"1. To accept delivery of said goods at points of shipment, receive the same on arrival, pay all freight charges thereon from the f. o. b. point or points named in the price schedules, and settle for the same at the dates, terms, and prices designated in the price schedules attached hereto. The purchaser shall pay for said goods in cash on or before the dates specified, and if not then paid, shall pay interest on such purchase price at the rate of 8 percent per annum and shall at any time upon the company's request execute and deliver a bankable note or notes for the purchase price of said goods or any of them, said notes to mature at the dates herein agreed upon for payment and to draw interest thereafter at the above named rate.

"2. The title to all goods shipped under this contract, with right of repossession for default, is reserved by the company until the purchaser has made full payment in cash for all of said goods and for all notes given therefor. Prior to full settlement in cash the purchaser shall have no right to sell or dispose of any goods delivered hereunder except for value received in the ordinary course of trade and upon the express condition that prior to the delivery of any of said goods to a customer, the purchaser shall secure from said customer a full settlement in cash or good and bankable notes and that the proceeds of all resales shall be considered the property of the company in lieu of the goods so sold and held in trust for it and subject to its order, as

provided in paragraph four hereof, until all sums due under this contract have been fully paid. At any time on request the purchaser will give .the company's representatives full information regarding goods on hand, goods sold and the proceeds thereof, to enable it to ascertain and enforce its reserved rights under this clause. Nothing herein shall release the purchaser from payment for all goods ordered and delivered hereunder and after delivery to him said goods shall be held at his risk and expense in respect to loss or damage from any cause and taxes and charges of every kind.

"8. In addition to the goods now ordered, all goods heretofore or hereafter shipped to the purchaser, between the dates of November 1, 1936, and October 31, 1937, both inclusive, shall be.considered as sold under this contract, and subject to all of its provisions, except as different prices or terms have been or may be agreed upon at the time, and it is understood that the company reserves the right to reject any orders for additional goods, or to change the prices and terms applicable thereto."

Likewise the truck contracts provided in part:

"1. ORDER. The company hereby agrees to sell and the dealer to buy, subject to the provisions of this contract, the International Motor Trucks and attachments listed below, and other attachments manufactured or sold by the company for International Motor Trucks, to be delivered at points of shipment to be selected by the company f. o. b. factory and paid for at the prices specified herein (less the discounts indicated) on sight draft attached to bill of lading.

"The prices quoted herein are not guaranteed to be effective after February 1, 1937, and goods shipped after that date shall be paid for at the company's prices to dealers then in effect in dealer's territory.

"16. FINANCING PLAN. After the initial shipment of trucks under this or a previous contract has been paid for in cash, the company agrees to accept from the dealer, in payment for trucks subsequently shipped, the notes of good and responsible customers taken in settlement by the dealer upon resale of International Motor Trucks. In such cases a time charge will be made in accordance with the company's regular finance plan in force at the time and no notes will be accepted unless the amount and terms of said notes conform to said finance plan and all other provisions of said plan have been complied with.

"20. TITLE RESERVATION. In case any property sold thereunder shall be delivered to the dealer before fully paid for the title to such property and to the proceeds thereof in case of resale, whether in cash, notes or securities, shall remain in the company until the full purchase price and any notes given therefor have been paid in cash, but nothing herein shall release the dealer from payment, and after delivery to the dealer, said property shall be held and used at his risk and expense in respect to loss or damage and taxes and charges of every kind."

Attached to each of the nine contracts was a list of machinery which the dealer ordered at the time the various contracts were executed. It does not appear that any of the property and machinery which was taken by the defendant sheriff under the writ of execution and now sought to be recovered by plaintiff in this replevin action was included in the property ordered and specifically described in these lists. Also attached to the contracts were certain books containing general lists of the goods which could be purchased according to the terms of each contract.

The demurring defendants argue that nowhere in these contracts can be found a description of the machinery and property now held by the sheriff and which plaintiff contends was covered by the contracts. Plaintiff answers that this property was property which the dealer, R. O. Allen, purchased from plaintiff under the terms of the contracts after those contracts had been executed and that in accord with the provisions of the contracts if the purchase price was not paid at the time the property was purchased then the title to such property remained in plaintiff company.

Under our statutes conditional sales and chattel mortgages are treated alike. (G. S. 1935, 58-314; *Christie v. Scott*, 77 Kan. 257, 94 Pac. 214; *Freuhauf Trailer Co. v. State Corporation Comm.*, 149 Kan. 465, 87 P. 2d 641.)

Although the question has arisen more often in the case of chattel mortgages, it cannot be doubted that in either a conditional sale or a chattel mortgage the property to be affected must be sufficiently described to enable third parties to identify the property from an inspection of the public records and such reasonable inquiry as may be suggested by the recorded instrument. The above rule of law has often been announced by this court. (See *Golden et al. v. Cockril*, 1 Kan. 259; *Savings Bank v. Sargent*, 20 Kan. 576; *Ehrke v. Tucker*, 99 Kan. 52, 160 Pac. 985; *Kohler v. Harlow*, 126 Kan. 215, 268 Pac. 122.)

In *Ehrke v. Tucker*, supra, the late Mr. Chief Justice Johnston, in writing the court's opinion, said:

"The defendants are presumed to have had knowledge of the contents of the chattel mortgage, and if by the description there given, aided by inquiries which it would naturally suggest, the cattle could have been identified, the description would have been sufficient to bind them. (*Waggoner v. Oursler*, 54 Kan. 141, 37 Pac. 973; *Rudolph v. Commission Co.*, 76 Kan. 789, 92 Pac. 1103.) A partial misdescription does not invalidate the mortgage (*King v.*

*Aultman & Co.,* 24 Kan. 246), but in determining whether a third party, aided by inquiries suggested by the mortgage, could have identified the property, the whole description is to be taken into consideration. The suggestion which indicates the line of inquiry must come from the mortgage itself, and cannot rest alone in the minds of the mortgagor and mortgagee."

For further authorities stating the same rule as to the necessity of adequate description of property upon which security is claimed when third parties are involved see 10 Am. Jur. 752, § 55; 14 C. J. S. 660.

Not only must the property upon which the security is claimed by the mortgagee or vendor in a mortgage or conditional sale be described, but certainly some indication of the amount of the debt to be secured must be stated in the instrument. (11 C. J. 473; 14 C. J. S. 685; *Bank v. Brecheisen,* 65 Kan. 807, 810, 70 Pac. 895.)

In *Cin. Leaf Tob. Warehouse v. Combs et al.,* 109 Ky. 21, 58 S. W. 420, the court of appeals of Kentucky said:

"A chattel mortgage reciting that it was executed to secure 'a certain sum of money' advanced to the mortgagor under a contract entered into on a day named, and that a note was executed therefor, is so uncertain as to amount that it does not, though recorded, operate as constructive notice to purchasers or creditors. . . ." (Syl. ¶ 1.)

The court has come to the conclusion that by liberal construction all that can be said from a reading of the contracts involved in this case is that they notified the public that if R. O. Allen, the dealer, should during the ensuing year decide to purchase any of the various implements, tools and machines which were offered for sale by plaintiff, and if the dealer did not pay cash for the goods as he had a right to do under the contract—nay, even was obligated to do as to certain trucks purchased under the truck contracts— then in that event plaintiff retained title to the goods until whatever should be due on the purchase price was paid. How were third parties to know what articles the dealer purchased for cash at some future date, what articles he made a down payment on and agreed to pay the balance in accord with the contracts, or what articles he bought entirely on credit? We find no indication in the contract from which any suggestion could be drawn by a third person as to the amount which could be assumed to be due on any of these articles which the dealer might order in the future.

There is another matter which inheres in the contracts under discussion and which further affects their sufficiency as against creditors of the vendee. All of the property involved in this suit seems

to have been ordered after the execution of the contract which is in each instance sought to be applied to the various articles of machinery now in the hands of the sheriff. In fact, it is only inferentially that it can be found from the petition which contract plaintiff contends applies to any particular piece of machinery. It has always been the law of this state that a chattel mortgage as to property afterward acquired by the mortgagor was good against third parties only within definite limits. (*Bank v. McIntosh,* 72 Kan. 603, 84 Pac. 535; *Holt v. Lucas,* 77 Kan. 710, 714, 96 Pac. 30; *Johnson v. Interstate Securities Co.,* 152 Kan. 346, 103 P. 2d 795; G. S. 1939 Supp., 58-322, 58-323.)

In the last section of the statute noted above future advances of funds are allowed, "but not to exceed in the aggregate an amount stated in said mortgage."

It has already been noted that conditional sales and chattel mortgages under our law are to be construed under the same rules. Moreover, it may be noted in passing that there is a difference between a present contract of sale and a contract to sell or a contract under which something remains to be done before the title passes. (24 R. C. L. 18.) Here the contracts provided only that if the dealer should decide sometime in the future to do so he might buy certain articles under certain terms, in some instances, providing those terms had not been changed.

If it be thought that these contracts sufficiently describe the property upon which plaintiff claims to have a security interest and the debt for which that security is claimed, can it be argued that if the dealer purchased a cultivator on credit and afterward paid for the same that it would be necessary to file a release of record as to that cultivator? How could it be so when the contract nowhere describes that particular cultivator?

Plaintiff stresses the case of *International Harv. Co. v. Poduska,* 211 Ia. 892, 232 N. W. 67, 71 A. L. R. 973. Counsel is correct in stating that the contracts there involved were similar to the contracts in the case at bar. But the supreme court of Iowa very carefully pointed out in that case that one defendant in that case, the dealer's assignee for the benefit of creditors, had under Iowa law no greater rights than the dealer himself (p. 896) and that the plaintiff in that case had obtained possession of the goods before the filing of the dealer's petition in bankruptcy so that the trustee in bankruptcy, who was the other defendant, did not have any

rights against the property such as would be possessed by a creditor armed with a writ of execution.

The other authorities cited by plaintiff have been examined and found not to be at variance with the views expressed above.

An unrecorded chattel mortgage under Kansas law is ineffective against a creditor with a writ of attachment or execution even though the creditor have actual knowledge of the unrecorded instrument. (*Geiser v. Murray,* 84 Kan. 450, 114 Pac. 1046.)

This court has reached the conclusion that it was error to overrule the demurrers of the defendants. The case is reversed with instructions to sustain the demurrers filed against plaintiff's petition.